## Case No. 2,759.

### The CITY OF NEW YORK.

[8 Blatchf. 194.] [1]

Circuit Court, S. D. New York. Feb. 6, 1871.

COLLISION—STEAMER AND VESSEL AT ANCHOR—FOG—LOOKOUT—SPEED—LIGHTS.

1. A steamboat, under way, colliding with a schooner at anchor in a customary anchorage place. *held* to be presumptively in fault and bound to excuse herself, by showing either that the schooner was in fault or that the accident was inevitable.

[Cited in The Florence P. Hall, 14 Fed. 417; The Rockaway, 19 Fed. 451; The Echo, Id. 454.]

2. There being a fog, the steamboat was also *held* to be in fault for not having a lookout on her bow.

3. The steamboat was also *held* in fault for being out of her proper track and for running at too great a rate of speed.

4. The schooner was *held* in fault for having her light in such a position that it was hidden from view by her sails, which were set.

In admiralty.

James C. Carter, for libellants.

Edward H. Owen and Charles Donohue, for claimants.

WOODRUFF, Circuit Judge. The schooner Mary Mankin was anchored on the usual anchorage ground for vessels of her class, in the harbor of New London, in the night of the 3d of May, 1862. The steamboat City of New York was one of a line of steamboats running between New London and the city of New York, entering or departing daily from the harbor of New London, and her officers

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

must be taken to have known that the place where the Mary Mankin lay was customarily used for the anchorage of vessels. The place was on the west side or edge of the channel, and, to the eastward thereof, the width of the channel was abundantly sufficient for vessels entering and departing to do so without any inconvenience. The usual track of steamboats entering and departing was very considerably to the eastward of the place where the Mary Mankin lay, and she had lain anchored at that place since the previous Thursday afternoon. The City of New York had, during that time, passed her more than once. At about half-past eleven o'clock in the night, the steamboat ran into the schooner, striking on her starboard side, and cutting her down on that side, so that she sank within a very few minutes. These facts raise a presumption of fault in the navigation of the steamboat, which casts upon her the burthen of excusing herself; and this would require proof either that the schooner was in fault or that the accident was inevitable.

The steamboat has, I think, failed to show herself without fault. The night was very foggy, the fog so dense as at times to shut out lights from view. It was not so dense near the water or for some feet above the water, but was so dense a little higher up, that a vessel entering the harbor shortly before the collision could not, when passing it, see the light of the light-house a short distance below where the Mary Mankin lay, and yet she could see a light on shore and on the schooner and on another vessel lying near, when she came near to them. The steamboat, coming from her wharf, did also see lights on shore and on some other vessels which she passed, but she saw no light on the Mary Mankin. A vessel was lying a short distance above the Mary Mankin and another a short distance below. The light of the first was seen from the City of New York a few moments, and but a few moments, before the collision, and the light of the other was not seen until after the collision.

The first fault I impute to the City of New York is, that she had no look-out on her bow. She relied solely upon observations made from her pilot house and made by her master and pilots, her master declaring that he was himself on look-out, and at the time engaged in nothing else. Without saying that, under any possible circumstances, the master cannot divest himself of other cares and assume and discharge the duty of a look-out, so as to satisfy the rules of navigation, it is clear, that, in general, one to whom belongs the responsibility of controlling and directing the conduct of all the affairs on board, is not a proper look-out; and it is clear that, on such a night especially, the duty could not be performed so as to comply with the rules of prudence or the law, without a look-out in his proper place. Indeed, I think that this case well illustrates the importance of a rigid enforcement of the rule, that a look-out must

be stationed forward, and for two reasons: (1.) If the fog was of uniform density, a man on the bow could penetrate it further, and see an object ahead sooner, than one who stood back at the pilot house; (2.) On such a night as this, when the fog was lighter nearer the water, he would see much further than the master or pilot, whose position was some eighteen or twenty feet above the water.

Again, I think the proof quite conclusive, that the steamboat was not, at the time of the collision, in her proper track down the channel. The general declaration of her master and pilots is, I think, overcome by the other testimony to the location of the schooner. One fact testified to by her own witnesses seems to me to render it certain that she was more to the westward than she should have been, and not only so, but that she was headed too far to the west. That fact is, that if she had not collided with the schooner, she would have gone between the two vessels between which the schooner lay. This is testified to by her own pilots. The proof touching the actual locations of those vessels, suggests that, if she had not struck the schooner, and had persisted in her course, she would probably have soon reached the shore.

I am not satisfied that the steamboat was running at a prudent rate of speed. The testimony of her master and pilots, confirming that of other witnesses, shows, that she did not, and probably could not, see the lights of the two vessels between which the schooner lay, until she was very near to them. In such a fog, with knowledge of the customary anchorage ground for vessels, and, especially, if she be taken to have known that the schooner was there at anchor, the highest degree of caution was required, either to keep her course well to the eastward, or to proceed so slowly as not to strike with power sufficient to cut a vessel nearly in two; or, else, if the fog was so dense as not to make these precautions practicable, not to attempt to go out. While the master, pilot and engineer describe her movement as slow, and as involving barely the motion of the engine, I think all the proof warrants the conclusion that her speed, at the time of the collision, was from six to eight miles an hour. True, this was in part due to the current setting out; but the alternative here again recurs—if the circumstances of danger called for a more moderate speed, she must observe it, or, if the current was such that she could not do so, and at the same time keep under control of her helm, she should not attempt it in so critical a situation.

I am, however, not satisfied that the accident is solely due to the fault of the steamboat. The proof does, indeed, abundantly show that the schooner had a light, and it also shows, to my entire satisfaction, not only that it was not seen from the steamboat, but that it was not visible to that or any other vessel coming down the channel. That channel was, according to the claim of the libellants, and by the concurring testimony of their witnesses, to the eastward of the place where the schooner lay. Indeed, one of their witnesses locates her on the very edge of what he calls the bank. She was headed, as the libellants allege and claim, and as their witnesses testify, north or but little to the west of north, meeting, head on, the current setting out of the harbor, and presenting her starboard side to the channel and to all vessels passing therein. This would be her natural position, and would be her permanent position, unless a wind should arise, violent enough to force her around against the current. Instead of having a light at her foremast, so elevated and open to view that it could be seen on either hand and however the wind might change her position, as, I think, she should have had, and instead of having the light on her starboard side, which might be permissible while she lay headed northerly, as the libellants allege she was, her light was placed in her port rigging. Heading northerly, the more clearly the libellants prove that she was on the westerly edge of the channel, the more conclusively they show that she placed her light where it was least likely to be seen by any to whom it was important to give notice of her presence. Whether persons on shore were so notified or not was of no importance. But, to make this error more certainly effectual to prevent vessels in the channel seeing her light, she had her foresail and mainsail set. Even if it were conceded, that, under ordinary circumstances, with sails all furled, a light in the port rigging might be sufficient and might be seen from starboard, she was bound to notice the effect of setting her sails, and, if there was adequate reason for setting them, to take care that her light was shifted or so set that the sails would not hide it; and she was bound, also, in reference to this precise point, to notice the direction of the wind and the position of these sails. On this occasion, the wind was southerly, blowing a little on her port quarter; and, of course, the sails, while hanging, would be in a line to receive the wind edgewise, and nearly fore-and-aft the schooner—a position well adapted to hide the light from view. That, if the light continued to burn brightly till the time of the collision, it was so hidden, is, I think, fully established. Now, although the steamboat was in fault, she was entitled to all the chances of avoiding collision, which a proper light in a proper place would give her.

It is strenuously insisted, that, before the collision, the schooner had, by force of the south-westerly wind acting upon her sails, been forced around to the eastward, so that her stern was much further out in the channel than the place where, after the collision, she was found. The claimants' witnesses describe her as lying crosswise the channel, when struck by the steamboat; and the length of her chain, 35 fathoms, is claimed

to have been too great and to have permitted such a result, from the action of the wind on her sails. It is quite clear, that, if this be true, the light was most effectually hidden from view; and that fault becomes more obvious. It is not shown, however, by express testimony, that the length of chain was unusual or greater than prudence required, though I am myself wholly unable to perceive the propriety of giving a vessel anchored on one side of the channel so great a length of chain that, if the wind arose sufficiently to swing her outward towards the channel, she would project from two to three hundred feet from her anchor into that channel. Upon all the proofs, I think that this effect had been but partially produced, and that the direction of the blow and the course of the steamboat indicate that, while this fact may have contributed to the result, it is not sufficient to exonerate the steamboat from responsibility.

A decree for contribution by each vessel to the loss should be entered, each party bearing their own costs.