## The Florence P. Hall.

(District Court, S. D. New York. December 8, 1882.)

1. COLLISION—INEVITABLE ACCIDENT—BURDEN OF PROOF.

　　Where, in case of a collision at sea at night, the defense of inevitable accident is raised, and the main issue is whether the weather was such that the lights of one vessel could be seen in time by the other to enable her by due nautical skill to keep out of the way, held, that the burden of proof is upon libelants to show, not only that their lights were burning, but also that the weather was such that they could be seen a sufficient distance to avoid the collision.

2. CONFLICTING EVIDENCE—CREDIBILITY OF WITNESS.

　　Where the testimony of witnesses from the two colliding vessels was in irreconcilable conflict as to the condition of the weather, held, that superior credit was due to those witnesses who were sustained by collateral evidence concerning the material subsidiary points respecting the force of the wind and time of the commencement of the rain, storm, and gale.

3. COSTS ON DISMISSAL—RULE OF.

　　Upon contradictory evidence as to the state of the weather, the libel in this case was dismissed on the ground of inevitable accident; but the case being doubtful on the merits, and the claimant's vessel having remained practically in concealment from the libelants for a year after the collision, held, that the

dismissal should be without costs, although costs are, in this country, ordinarily allowed on dismissal in cases of inevitable accident, as in other cases, though it is otherwise in England.

In Admiralty.

*Beebe, Wilcox & Hobbs*, for libelants.

*A. J. Heath* and *R. D. Benedict*, for claimants.

BROWN, D. J.   The libel in this case was filed by the owners of the schooner Flying Fish to recover damages for a collision with the schooner Florence P. Hall, at sea, at about 10 P. M., on April 9, 1874, at a point about 15 to 20 miles west of Montauk Point, and about 6 to 8 miles south of Long Island.   The Florence P. Hall was a two-masted schooner, about 115 feet long, and of 245 tons burden, laden with lumber and laths, and bound from St. John, Nova Scotia, to Philadelphia.   The Flying Fish was also a two-masted schooner, about 74 feet long, and of 76 tons burden, returning from the South Sea Islands, with seal-skins and oil, light loaded, and bound for New London, Connecticut.   At the time of the collision the wind was E. N. E. The Florence P. Hall was sailing wing-and-wing, with the wind dead aft, on a course W. S. W., with her mainsail and jibs upon her port side.   The Flying Fish was sailing close-hauled on her starboard tack, and due north by compass.   Each vessel had the proper lights set and burning, and, as is claimed by each, a proper lookout.   It is not denied that in ordinary weather it would have been the duty of the Florence P. Hall to keep out of the way; and the defense on her part is that the collision was the result of inevitable accident, on account of the thickness of the weather; that as soon as the light of the Flying Fish could be seen, when about half a length distant, she immediately ported her helm, but was unable to avoid the Flying Fish, which, in a few seconds afterwards, ran into her just abaft the main rigging on the port side.   Both vessels were seriously injured by the collision; the stem, bowsprit, and jibs, and the foretop-mast and forestay of the Flying Fish were carried away, the foremast loosened so as to sway back and forth, and her hull soon commenced leaking.   On the following morning she was picked up by the steamer Florida and towed into Providence.   The Florence P. Hall had a bad hole stove in her hull partly below the water line; the lanyards of her main-rigging on her port side were carried away, and the jaw of the main-boom broken.   By putting her upon a port tack, and throwing overboard and shifting part of the cargo, the crew were able to keep her above water by the use of the pumps, and she reached Philadelphia on the 12th.

The libelants claim that the night, though very dark, was a good one for seeing lights; that the wind was moderate, and that there was neither storm nor fog nor rain up to the time of the collision; that the red light of the F. P. Hall was seen by those on board of the Flying Fish at least 20 minutes before the collision, when about four miles distant, and continued to be seen all the time until the accident. This account is substantiated by the master and second mate, who were at the wheel, by the lookout forward, and another seaman who was on deck. They testify that the F. P. Hall bore about two or three points on their starboard bow, and continued on the same bearing until she was at least three lengths distant, when she suddenly ported her helm and swung to starboard, with her hull distinctly in view, from half a minute to a minute before the collision, so as to pass their bow; and that the Flying Fish kept on her course unchanged until they struck.

On the part of the Florence P. Hall, the captain, who was at the wheel, the first and second mates, and one seaman, testify that the weather was so thick with rain, snow, and sleet that a vessel's light could not be seen more than half her length distant; that the light of the Flying Fish was reported by the lookout when about that distance off their port bow, and as soon as it was visible; that the foghorn was put in the hands of the lookout at about 9 P. M., when it shut down thick; and that the horn was blown by him every two minutes or oftener—some of the witnesses say every few seconds—from that time until the collision. The witnesses from the Flying Fish say that no horn was heard by them; that they used none, and that none was needed, as the night was a good one for seeing lights, and that there was no rain nor storm nor thick weather at all, until from 1 to 3 o'clock at night. The lookout of the F. P. Hall was not called as a witness, as he could not be found after this suit was commenced, which was about a year after the collision, owing, as alleged, to the inability of the libelants to discover the other colliding vessel sooner.

In this conflict of evidence each side sought confirmation of its own story from other vessels passing in the region of the collision the same night, and also from the weather bureau, signal stations, and light-houses on this part of the Atlantic coast. From this evidence I regard the following facts as established: That the eighth of April was marked by a thick fog, with light winds, prevailing generally in all this region; at the same time a north-east storm was approaching from the south-west. Early in the evening of the 9th this storm began to be sensibly felt in this vicinity. At 7 P. M. the

weather entry at the New York station was, "Weather *thick* with *rain and fog;* wind N. E. in strong gusts; 9 P. M., N. E., 22 miles per hour; 9:30 P. M., 25 miles, (a common gale;) at 1 A. M. of the 10th, the storm at its height—the wind 36 miles." At Sandy Hook, "Light rain; ends at 5:40 P. M. of the 9th; began again at 9:40 P. M.;" wind at "9 P. M., 23, and at 11, 34 miles;" no fog noted. At Block Island, "April 9th, wind fresh, with fog and rain; fog signal not used after 2 A. M." At Montauk Point, "April 9th, weather rainy at 9 P. M. and wind 25 miles." At Shinnicock station, "April 9th, commences with fog and rain; the middle and latter part the same." At New London, April 9th, "Light rain; ends 5:30 P. M.; heavy rain begins 9:55 P. M."

Each side also called witnesses from two steamers—the libelants, from the Holsatia and Florida; and the claimants, from the Saxon and the Aries. The Holsatia was on her voyage from Europe to New York, and at 10 o'clock, the time of the collision, was, as near as I can judge from the testimony, about 30 miles to the eastward. The other three vessels were between Montauk and Barnegat; the Saxon, between 30 and 40 miles distant from the place of collision to the south-west; the other two vessels somewhat further distant in the same direction. Copies of the logs of all these vessels were put in evidence, except that of the Florida, which could not be found. One witness was examined from each vessel; but as their testimony was taken nearly five years after the collision, less reliance is to be placed upon it where not sustained by the entries in the log, or by other circumstances calculated to impress upon the mind the particulars of that trip.

The log of the Saxon notes on the 9th, at "7:30 A. M., (when off Nantucket,) wind N. N. E., brisk; thick fog and rain, having seen nothing since 5 P. M. yesterday; strong N. N. E. gales throughout the middle and latter part of this day: April 10th, 3 A. M., strong gales; Barnegat N. N. W., 25 miles, dead reckoning; April 10th, at 8:40 A. M., wind N., fog cleared away." Her captain testifies that at 9 P. M. on April 9th, he was about 40 miles off Shinnicock; that the weather was then very thick and squally—at times could not see the length of the vessel; from 9 to 12 P. M. could see about three or four hundred yards—sometimes more, sometimes much less than that; that he narrowly escaped running into one vessel about that time of night on account of the thick weather; and that he sounded his fog-whistle constantly during the thick spells.

The log of the Aries notes on the 9th: "P. M., cloudy and rain;

8 P. M., fresh gales, E. N. E., with heavy head sea; midnight, fresh gales—rainy."

The log of the Holsatia is extremely meager for the whole voyage. For the 9th it is only, "Moderate breeze—much rain; 7: 30 P. M., took pilot." The pilot "thinks" there was no fog. He says it was rainy, and that the weather was not thick. The indistinctness of his memory is, however, shown from his placing the wind from the south-east, a different quarter of his vessel.

The libelant's witness Rogers, captain of the Florida, who testified without the benefit of his log, or any written *memoranda* of the voyage, says the weather was not thick; but he says the gale was at its height at midnight, April 9th, and that he ran that night at half speed. The claimant's witness Sawyer testifies that Rogers told him, a few months before his testimony, that he slowed on account of thick weather and fog. Rogers denied this upon the trial, and testified that he told him he slowed on account of the heavy sea. He also testified that he picked up the Flying Fish at about 7 A. M. of the 10th, and that the mate told him that at the time of the collision they were standing off shore. He must have been incorrect in this, as the Flying Fish was at the time standing directly towards the shore; and the other witnesses also testify that they were picked up at about 10 o'clock instead of 7.

The mate of the Aries testified that the weather was very thick all that night; that the fog-whistle was blowing constantly; that his watch ended at 8 P. M., but he remained on deck an hour and a half afterwards, because he did not feel safe.

From this evidence it is clear that the storm had fully set in all the way from New York to Montauk Point, and that it was blowing a gale over this whole region, between 9 and 10 P: M. of April 9th; that the weather was rainy, and more or less thick, varying somewhat in these respects at different times and at different places over this area. All the testimony from this collateral source agrees that the gale had begun and that it was blowing heavily long before midnight. The time of the commencement of the storm and of the rainy weather, are material circumstances in connection with the disputed issue as to the thickness of the weather. All the witnesses from the Flying Fish are shown to be grossly incorrect in these particulars. They say the wind at the time of the collision was a moderate breeze. Her captain testifies that it did not storm at all before 3 o'clock, nor was there "any rain, fog, or snow, before 3 A.

M., when it came on blowing and commenced to rain, with fog, and grew very rough." Two other witnesses testified that there was none before 1 or 2 A. M.

The testimony of the witnesses from the F. P. Hall, as to these points, is in accordance with the facts which I regard as proved from the collateral evidence above noted. One of her witnesses testifies that he knows it rained, because when he went on deck at about half-past 9 to reef the mainsail, he came up without putting on his oil suit and got wet.

Where there is irreconcilable conflict between witnesses upon the principal point in issue, it is indisputable that superior credit is due to those witnesses whose testimony upon other material points is in accord with facts otherwise proved, rather than to those witnesses whose testimony on those points is shown to be incorrect.

The testimony of the witnesses on board the Flying Fish, as to the wind and rain, and the commencement of the storm, is proved to be so incorrect that superior credit must be given to the witnesses from the F. P. Hall in regard to the main point of the thickness of the weather at the time and place of collision.

Misrepresentation or gross exaggeration is, moreover, far more common and probable than downright fabrication of testimony. The time and distance at which the red light of the F. P. Hall is alleged to have been seen from the Flying Fish, are in my judgment such exaggerations. The testimony of all the witnesses from the F. P. Hall, on the other hand, in regard to the fog-horn being blown by their lookout, if not true, is sheer fabrication. Several of the witnesses who testify to this fact were not connected with the claimants at the time of giving their testimony, and there is no sufficient ground in this case for attributing to them such a piece of fabrication. Probable occasion for the use of the fog-horn is established by the collateral evidence. But if the horn was given to the lookout at 9 o'clock and thenceforward blown, as testified to by all on board, it cannot be supposed that this was done except on account of thick weather, such as in the judgment of the master required the fog signal to be blown.

As evidence that lights could be seen that night, the captain and two witnesses from the Flying Fish testify that after the collision the Flying Fish followed the F. P. Hall right on for about an hour to find out what vessel she was, guided by a light moving on her deck, but was outsailed by her; but I think that the weight to be

attached to these statements is much impaired by the averment in the libel that the Flying Fish by the collision "became unnavigable," and by the testimony of the master that "the collision crippled me so that she was unnavigable and could do nothing with her, and we lay in the trough of the sea," and by testimony to a similar effect from the other two witnesses.

The shortness of time between seeing the light of the Flying Fish and the collision and of the distance of the two vessels apart, are probably somewhat exaggerated by those on board the F. P. Hall. All except the cook say it was but from three to five seconds in time, and half the schooner's length in distance. Two circumstances seem to show that each was considerably greater. The first mate was standing near the mainmast when the light of the Flying Fish was reported. The captain immediately ported his helm. This caused the foresail to be taken aback and to gibe over to the larboard side; whereupon the mate, as he testifies, ran forward to cast off the guy, and he was just getting down from the deck-load forward (which was six feet high) when the vessels struck. All this could scarcely have taken place in less than half a minute. Again, the cook, who was below, heard the cry, "Light, ho! Hard a-port; she will run into us." He immediately got up, put on his oil suit, and had just got on deck when the collision came. He estimates this took 15 or 20 seconds; half a minute is probably more nearly correct. The vessels were approaching each other at the rate of about 12 miles per hour, as the Flying Fish was sailing at the rate of about 8 knots, and the F. P. Hall at about 6 knots, (her mainsail being nearly down,) upon lines converging at an angle of about 112 deg.; so that, if half a minute elapsed after the light of the Flying Fish was seen before the collision, they must then have been about 500 feet apart; or, if only 15 to 20 seconds intervened, they would have been about 300 feet apart. Either of these distances was altogether too short a space in which to ascertain the exact course of the Flying Fish, so as to determine, and to take, the most certain and effective measures to avoid her. By starboarding, instead of porting, the F. P. Hall might possibly have gone astern of the Flying Fish, as two of the witnesses from the Flying Fish thought she might have done. But as there was not sufficient time or opportunity to wait and observe the course of the Flying Fish before endeavoring to clear her, it cannot be set down as a fault in the F. P. Hall, where instantaneous action was required, that she did not starboard rather than port, even if the former would

have been better, which is by no means certain. *The John Stuart,* 4 Blatchf. 444. The light of the Flying Fish was between abeam and off the port bow, and porting seemed the safer course. As it was, she very nearly escaped, the point of collision being only some 25 to 30 feet from her stern; and in my judgment there is no question that had she been aided by the Flying Fish's porting at or about the same time, and when the latter's witnesses say they first saw the F. P. Hall porting, both vessels would easily have escaped without injury.

The estimate I have given of the distance at which the light of the Flying Fish was first seen by the F. P. Hall, is supported by the testimony of those on board the Flying Fish as to the time when they saw the F. P. Hall swing to starboard under a port wheel. The captain and first and second mates all testify that they saw her thus swing to starboard when about three times her length distant. The second mate, who was at the wheel, testifies that he saw her hull distinctly, and that she was swinging to starboard, and that both vessels had then more than three lengths to run before the collision, and that the time was about from half a minute to a minute. The captain testifies that he saw her masts passing across his bows about half a minute before the collision. If the hull and masts could be thus plainly seen by them anything like half a minute before the collision, since the course of the F. P. Hall must have been also thereby recognized, (and her course being in fact at that time nearly at right angles to the course of the Flying Fish,) it was inexcusable in the latter not to port her helm immediately on seeing this maneover of the F. P. Hall. Instead of doing this, they kept straight on, as they testify, and struck nearly a square, right-angled blow. The Flying Fish was a small, sharp vessel, less than half the size of the F. P. Hall. She was light loaded and "minded her helm quickly," and had she ported when her master and officers say they saw and recognized the position and course of the F. P. Hall, she would plainly have made far more to windward than the few feet necessary to pass safely astern of the F. P. Hall. If, therefore, they had thus seen and understood the latter's course at the time they say they did, it seems to me very improbable that they would not have then ported. That they did not do so is only explainable upon the supposition that only her light was then made out, and that the course and bearing of the F. P. Hall did not become known to them until afterwards, and only a few moments before the collision; not long enough to enable them to determine with safety upon any change in their course.

Nor can I agree with the libelant's claim that the burden of proof is upon the respondents. Where, as in this case, the defense of inevitable accident is raised, and the pleadings make a direct issue upon the question whether the weather was such that the lights of the libelant's vessel could be seen in time to enable the claimants' vessel, by due nautical skill, to keep out of the way, the burden of proof is upon the libelants to show, not only that their lights were set and burning, but also that the weather was such that they could be seen a sufficient distance to avoid the collision.

The basis of all actions of this character is some fault in the respondents. In the case of *The Morning Light*, 2 Wall. 550, 556, the court say: "Where the collision occurs exclusively from natural causes, and without any fault or negligence of either, the rule of law is that the loss must rest where it fell. The mere fact that one vessel strikes and damages another, does not of itself make her liable for the injury, but the collision must, in some degree, be occasioned by her fault." *The Mabey and Cooper*, 14 Wall. 204, 215; *Butterfield* v. *Boyd*, 4 Blatchf. 356.

It, therefore, devolves upon the libelant, as a part of his case, to show affirmatively the fact of the respondents' negligence, or the existence of those circumstances and conditions from which negligence is legally inferred. In case of a collision on a dark night, these necessary conditions include proof, not merely that the libelant's vessel had proper lights set and burning, but also that the night was such that the lights were visible at a distance sufficient to enable the other vessel, by due nautical skill, to keep out of the way. Otherwise, no negligence can be inferred. Where the issue of thick weather is raised, I think there is no legal presumption of fact concerning it, one way or the other; or that the weather was clear, rather than thick. It is a pure question of fact, to be determined upon the evidence, before any negligence can be legally attributed to either party, and the burden of proving it falls, necessarily, therefore, upon the libelants. The seventeenth and twenty-third rules of navigation do not affect this question. They were not intended as rules of evidence, or designed to change the burden of proof, or to create any presumption of fault in one party rather than in the other; but only to establish guides for navigation under conditions where the observance of these rules is possible. Rule 24, moreover, shows that all the previous rules are intended to be qualified by the existence of any special circumstances or dangers of navigation. In those cases where it has been held that the burden of proof was upon the steamer, or

the vessel sailing with the wind free, to excuse herself for not keeping out of the way, either there was no question concerning proper lights and the clearness of the night, or else the position of the sailing vessel was known, and negligence was, therefore, a legal inference from the other facts proved. *Leavitt v. Jewett*, 11 Blatchf. 419; *The City of New York*, 8 Blatchf. 194. But where the condition of the weather is in issue, there can be no inference of negligence in not "keeping out of the way," until that issue is determined; and the burden of proof is, I think, with the libelant. *The Roman*, 14 FED. REP. 61. If, however, I am in error on this point, I must hold, for the reasons previously stated, that superior credit is due to the witnesses of the F. P. Hall as to the thickness of the night at the time and place of collision, and that the libel should, therefore, be dismissed.

I have not overlooked certain circumstances attending the case of the F. P. Hall calculated to raise suspicions concerning the good faith of her defense; namely, the failure to call her lookout as a witness, which is explained as above stated; and, *secondly*, the failure of her owners to communicate with the libelants, when, shortly after the collision, they had notice that the Flying Fish had been towed into Providence from a collision that night. The respondents could hardly have been misled by the erroneous statement in the newspapers that the vessel colliding with the Flying Fish was a three-masted schooner instead of a two-masted one, considering their defense of the darkness of the night; and they remained practically in concealment from the libelants for nearly a year, until accidentally discovered, when this suit was at once commenced.

While communication with the other injured party in such cases would seem to be the natural, frank, and honorable course, it was, nevertheless, no legal duty. And if the facts concerning the weather are as I have found them, then the danger of misrepresentation of the facts by those on board the other vessel, and the hazards of a long legal controversy, which this case illustrates, go far to excuse, if they do not wholly justify, the policy of reticence; while, on the other hand, it is not improbable that this very reticence confirmed the libelant's belief in the respondents' fault; and had the latter communicated at once with the libelants and given their version of the facts, probably less diversity of statement would have arisen, and this long litigation might possibly have been wholly avoided. These circumstances are, therefore, at most, but possible grounds of sus-

picion, and in this case are not sufficient to cause me to withhold from the libelant's witnesses the credit which I have found them entitled to from their general accuracy as confirmed by the collateral testimony.

Since the foregoing was written, my attention has been called to several late cases in the English admiralty courts which seem to sustain the views above expressed as to the burden of proof upon the plea of inevitable accident, (*The Marpesia*, L. R. 4 P. C. 212, 219; *The Benmore*, L. R. 4 Ad. & Ec. 132; *The Abraham*, 2 Asp. Mar. Cas. N. S. 34;) and these cases seem to have been approved by Judge BLATCHFORD, in a late case in the circuit court of this district, (*The L. P. Dayton, etc.*, 18 Blatchf. 411; 4 FED. REP. 834.)

As regards costs, the practice in the English courts of admiralty has been long settled, in cases where the libel is dismissed on the ground of inevitable accident, not to grant costs unless the suit was brought without probable cause. 1 Parsons, Shipp. & Adm. 545; *The Marpesia*, L. R. 4 P. C. 212, 221; *The Itinerant*, 2 W. Rob. 236; *The London*, 1 Brown & L. 82. This practice has not, I think, been generally adopted in this country—certainly not in this district; but costs have been given to the prevailing party, as in ordinary cases. In the case of *The Morning Light*, upon the dismissal of the libel on the ground of inevitable accident, the question of costs was argued before Judge BETTS, in this district, in 1859, and costs were allowed by him against the libelants, and the decree was affirmed in the circuit, and afterwards in the supreme court, with costs. 2 Wall. 550. The records in this court also show that in the case of *The John Stuart*, 4 Blatchf. 444, the libel was dismissed "*with costs*," and the decree was affirmed in the circuit. In the case of *Stainback* v. *Rae*, 14 How. 532, the court below decreed for the libelants. The supreme court reversed the decree on the ground of inevitable accident, and directed a decree dismissing the libel, with costs. As both the inferior courts in that case had decided in favor of the libelants, it could not be said that there was not strong reasonable ground for the suit; nevertheless, on reversal, the supreme court awarded costs against the libelant. See *Arbo* v. *Brown*, 9 FED. REP. 318.

The present case, however, has, upon long consideration, seemed to me so difficult and doubtful upon all the testimony, and the course of the claimants in keeping themselves unknown and in practical concealment from the libelants having so naturally tended to confirm

the owners of the Flying Fish in their belief that the F. P. Hall was in fault, that I deem it more just, in this instance, to withhold costs. *The Rhode Island,* 8 Ben. 50.

Libel dismissed.