## THE LURAY.[1]

### VICKERY and another v. THE LURAY.

### ROLLISON v. THE LURAY and THE GRACE.

*(District Court, E. D. Virginia. March 16, 1885.)*

1. COLLISION—STEAMERS—FOG—FAULT.
   A steamer moving south, on the western side of the channel, at the rate of four and three-fourth miles an hour, with the tide, which rate is barely sufficient for steerage way, there being a dense fog at the time, is not moving so fast as to be in fault for a collision with an approaching steamer, which is moving at the rate of five and one-third miles an hour against the tide.

2. SAME—SPEED.
   In a dense fog a speed of five and one-third miles an hour, against the tide, in a narrow channel, when the vessel is under full command of steerage-way, is too rapid.

3. SAME—WHISTLE—PERSONAL INJURY TO CREW.
   A steamer which runs through a dense fog with a whistle blowing so feebly and imperfectly that it gives no notice of her proximity to neighboring vessels, is at fault, and one of her crew, who has been injured in a collision with an approaching vessel not in fault, may recover of the steamer employing him damages for such injury.

In Admiralty. In a cause of collision.

*White & Garnett,* for the Grace and owners.

*Whitehurst & Hughes,* for J. W. Rollison.

*Sharp & Hughes,* for the Luray and owners.

HUGHES, J. On the morning of January 30, 1883, the steamers Luray and Grace came in collision about midway of the ship channel, a quarter of a mile N. ½ E. from the Craney island light-house, in Elizabeth river. The Luray was on her usual trip from Hampton and Old Point Comfort to Norfolk. The Grace was bound out from Norfolk on a trip into the Rappahannock river. The collision occurred, according to the weight of evidence, at 9 o'clock, 48 minutes, A. M. The Luray struck the Grace on her port side, at an angle of about, or nearly, 30 deg., a little abaft of midship and forward of her boiler, and penetrated her hull to within three feet of her side on the starboard quarter. The keel of the Grace was not struck. The Grace sank at once in five and a half fathoms of water. All on board were saved, except one passenger, who was in the cabin below, whose body was recovered the next day. Her fireman, James W. Rollison, was severely injured, and one passenger sustained temporary injury. The headway of the Luray was arrested by the contact; and she gave all the assistance that was possible in saving the crew and passengers of the Grace.

The collision occurred in a very dense fog,—in what is called a fog-bank,—which the Luray had entered four-fifths of a mile below, at

[1] An appeal is pending from these decisions.

buoy 7. This dense fog had prevailed during the whole trip of the Grace from Norfolk to the place of collision. The distance of this place from Craney island light-house was 520 yards, and from buoy 7 was 1,670 yards by the chart.

The owners of the Grace file their libel against the Luray, claiming $10,000 of damages, which they claim to have sustained from the accident, and produce evidence to show their actual outlay for repairs to have exceeded $7,000. The contention of the libelants is that the Luray was running too fast on the occasion, in such a fog as then prevailed, and did not give proper signals, duly announcing her whereabouts, by steam whistles.

The Grace is a steamer of about 41 tons; and she had but little freight. She was built for a fishing steamer, and had large holds in her hull. She is of light structure, but was strong and staunch. Her breadth of beam was $16\frac{1}{2}$ feet, and her length 85 feet. The Luray is a very strong and staunch boat, 150 feet in length of keel, and had a tonnage of three to four hundred tons. The evidence taken by parties on either side in this cause is unusually voluminous; and on several points is absolutely contradictory and irreconcilable. I will not undertake to review it; though I have given it frequent perusals and much thought. I shall confine myself in what follows to what seem to be the most important questions in the case; chiefly to the inquiry whether the Luray was at fault in being in the place where the collision was, or in running too fast in the fog that she was in at the time of the collision; and whether she was also at fault in respect to fog signals, and other precautionary measures.

The evidence of respondents shows that the Luray left the wharf at Old Point Comfort sharply at 9 o'clock, and, the fog being light at the time, came at her usual speed of 12 miles an hour to Sewell's Point wharf; that she ran in at that wharf, and was seven minutes there putting off cargo; that she resumed her trip and came on for Norfolk, having lost 10 minutes in going to, stopping at, and again getting under way from Sewell's Point wharf; that she came as far as buoy 7 at the rate of 10 miles an hour, or somewhat more, the fog still not obstructing the vision; that she reached buoy 7 at 40 minutes after 9 o'clock, and there struck and entered the fog-bank; that she immediately slowed down her speed, which, in the course of the three succeeding minutes, was reduced to half-speed; that she continued still to check her speed for three minutes longer; that at the end of six minutes from buoy 7 she ported her helm a little, which nearly destroyed her steerage-way, going on a flood-tide only at the rate of "4 or 5 miles an hour, not more than that, over the ground;" that two or three minutes later, as her engineer was about to increase her speed, in order not to lose her steerage-way the Grace shot out of the fog across her bows so near to her that all witnesses agree it was impossible to avoid a collision.

The evidence further shows that the Grace was crossing the bows

of the Luray at an angle of about or nearly 30 deg., although the Grace's pilot and master testify that she was moving N. ¼ W., and although the navigators of the Luray testify that she was moving S. ½ E. up to three minutes before the collision, when she ported her helm a little, throwing her slightly further to the west. Here is a point in regard to which the evidence is conflicting. The burden of proof is on the libelants, and the evidence leaves this matter in doubt, with the probabilities against the Grace. It is conceded that the angle of collision was about 30 deg. The Grace claims to have been heading directly from buoy 9 to buoy 7; but she was in fact 85 to 100 yards to the west of this course when the collision occurred. She must have passed near Craney Island light-house, (which, by the chart, is 115 yards westward of a straight course from buoy 9 to buoy 7;) for Capt. Kenney, her master, testified that he was steering from the light-house for a buoy a quarter of a mile north, which could only be red buoy 8, which is due north of the light-house, and which is, by the chart, 120 yards west of a straight course from buoy 9 to buoy 7, on the western edge of the channel. Her pilot must have been aware of this fact, and must have been crossing obliquely eastward to regain the course he was intending to pursue when the collision occurred. The Grace was under the disadvantage of a thick fog all the way down, was continually uncertain of her position, as was shown by her master's constant heaving of the lead, and could not avoid varying materially from her intended course a great part of the time. Moreover, her pilot was not a licensed Virginia pilot, and her master was not especially familiar and experienced in these waters. If the Grace had been on a direct course from buoy 9 to buoy 7, as she desired to be, the chart shows that at the time of the collision she would have been 100 yards to the east of where she actually was, and that a collision would not have been possible.

It was not a fault that the Luray was where she was, near the western edge of the ship channel, with helm a-port. Unless signaled to the contrary, vessels usually pass each other port to port, each one passing on her starboard side of the channel. This is where the Luray was running in coming up the channel, and it is not pretended that she got a signal to pass the other side. The middle of the ship channel at that place is shown by the evidence and the chart to be not more than 50 yards from the west bank; while on the east side there is more than half a mile of deep water, spreading out to the mouth of Tanner's creek. I conclude from all the evidence under this head that the Grace before the collision had been quite near the west bank of the channel, and that this not being the proper side for a vessel going north, she was crossing over to gain a direct course from buoy 9 to buoy 7, when she encountered the Luray; that at that moment she was heading much more directly across the channel than a course N. ¼ W.; and that, by being on her port side of the channel, in a fog, and in addition crossing the channel at an angle

of nearly 30 deg., she rendered a collision with any vessel meeting her more or less inevitable.

The unfortunate position and attitude of the Grace at the time of the collision would not relieve the Luray of fault, however, if, at the time, the Luray was running faster than is allowable in a fog. The speed of the Luray, therefore, while in this fog-bank, is the very gist of this case; and I shall enter into the inquiry on that point with all the minuteness of scrutiny which the case admits. The proof is that she left Old Point wharf sharply at 9 o'clock; that she ran at the rate of 12 miles an hour until reaching Sewell's point; that she lost 10 minutes in touching at the wharf there; and that she was at buoy 7 at 40 minutes after 9. The distance from Old Point to buoy 7 is shown by the chart to be 11,385 yards, or five and a half nautical miles. If the Luray had run at the rate of 12 miles an hour over the whole distance, then calculation shows that, allowing 10 minutes for the delay at Sewell's point, she would have reached buoy 7 at 9 o'clock, $37\frac{1}{2}$ minutes; but the proof is that she did not reach there until 9 : 40, having lost $2\frac{1}{2}$ minutes by running at less than full speed between Sewell's Point wharf and buoy 7. From that buoy to the place of collision is shown by the chart to be 1,670 yards, or rather more than four-fifths of a nautical mile. The collision occurred at 9 o'clock and 48 minutes. The Luray was therefore eight minutes in running the 1,670 yards. It is important to ascertain how those yards were run. On reaching buoy 7 the evidence is that she was running at the rate of ten miles an hour, and that she was then rung down to slower speed in consequence of her having entered the fog-bank. Her navigators testify that in three minutes she had been brought down to half speed, say six miles an hour; that she continued to be brought slower for three minutes longer; that then her helm was ported a little, which still further checked her steerage-way; and that in two minutes more, when the collision happened, she had scarcely enough steerage-way for navigation. I will endeavor to distribute her speed in these eight minutes. Counsel for respondents insist that this interval between buoy 7 and the collision was nine minutes. I assume that it was only eight minutes, which assumption is to that extent adverse to them.

If the Luray ran at the average rate of nine and one-half miles an hour during the first minute after passing buoy 7, at the average rate of eight miles during the second minute, and at the average rate of seven miles during the third minute, the result was as follows: She ran in the

| | |
|---|---|
| First minute, | 330 yards. |
| Second " | 277 " |
| Third " | 243 " |
| Total | 850 yards. |

—and at 9 :43 she was within 1,670 less 850 yards, or 820 yards, of the place of collision, and within five minutes of the time of the ac-

cident. If she then ran all these five minutes at an equal speed, and was not slowing down still more, as the evidence shows that she was doing, she ran during this five minutes at the rate of 164 yards a minute, or rather less than four and three-fourths miles an hour, and struck the Grace when at that speed. And this mathematical showing verifies the statement of Capt. Schermerhorn that at the time of the collision the Luray was running at the rate of "4 or 5 miles an hour, not more," (see page 7 of the testimony bound in book form;) and of Mr. Ross, the engineer, who states (page 2 of his testimony) that she was running at the rate of three to five miles after she had slowed down; and of Capt. Skinner, a Virginia branch pilot, who was on board, and who estimated her speed to be four miles an hour.

It is to be observed that the tide was running flood, at the rate of about one mile and a half per hour; and that though the Luray was running, at the time of the collision, about at the rate of four and three-fourths miles over the ground, yet her steerage-way in the water was only three and one-fourth miles. This was scarcely steerage-way enough; and in point of fact, Mr. Ross, the engineer, testifies (page 3) that, after the rudder had been put across the stern, he was "afraid she did not have steerage-way, so, when he got three bells, he was in the act of opening her out a little." Corroborating this view is the fact that so large and powerful and weighty a boat as the Luray was stopped in her course by coming in contact with so small, light, and yielding a boat as the Grace, and stopped before she had cut across her hull by nearly three feet. If the Luray had had the headway with the current of 10, or even 8, miles an hour, her navigators say that she would have passed entirely over the Grace, with headway enough left still to go on.

I think the conclusion cannot be resisted, and is entirely warrantable, that the Luray was running when she struck the Grace at the lawful speed of about four and three-fourths miles over the ground, and that this, on the flood-tide then prevailing, afforded her only enough steerage-way for safe navigation. None of the decisions of the courts require a steamer running in a fog to slow down to a point at which her steerage-way would be lost or unduly diminished.

I do not propose, in dealing with the libel against the Luray, to go into the question whether the Grace was, in respect to her own crew and passengers, in fault on the occasion of this collision; but yet, it may be incumbent on me in the *Luray Case* to consider some of the points contended for by the officers and crew, and the counsel, of the Grace.

As to the Grace's whistle, the evidence is in hopeless conflict, and I shall not discuss it. I pass to the question of the speed at which the Grace ran in coming down the Elizabeth river to the place of collision. All her witnesses testify that she left her wharf at Norfolk at about 9 o'clock on the morning of January 30, 1883. Her engineer, Brightman, who looked at the clock in his room, fixed the time at just five

minutes after 9 o'clock. The distance to the place of collision is shown by the chart to be four nautical miles from Campbell's wharf. The officers, crew, and some of the passengers of the Grace say, generally, that her speed down river was about three miles an hour. Now, if this were so, it took the Grace one and one-fourth hours to run the four miles, and the collision did not happen until fifteen minutes after 10 o'clock. If this were so, then the Luray would have been running an hour and a quarter (less 10 minutes for touching at Sewell's point) in coming from Old Point. That is to say, she would have made the trip of, six miles and three-tenths in an hour and five minutes. This is at the rate of six miles an hour averaged for the whole distance, making no allowance for slowing down after entering the fog-bank.

The theory, therefore, that the Grace ran only at the rate of three miles, would exonerate the Luray, by establishing that, after slowing down from her average speed of 6 miles an hour to "4 or 5 miles, not more," just before the collision, she was not in fault, having at that speed not more than enough steerage-way. But the engineer of the Grace testifies that a little while before the collision his clock showed 9 o'clock, 44 minutes. His clock showed Norfolk time. The Luray's showed 3 minutes slower than Norfolk time. So that the Grace left Norfolk at 2 minutes after 9 by the Luray's clock. We have seen that the collision occurred at 48 minutes after 9 by the Luray's time; which would be 45 minutes after the Grace left Norfolk. Thus the testimony of the officer of the Luray, who looked at her clock, and that of the officer of the Grace, who looked at his clock, concur unconsciously in fixing the time of the collision. This concurrence of the only witnesses whose testimony was definite and distinct is worth more than that of a dozen witnesses who guessed the speed of the Grace in passing through a thick fog, when all objects that could afford an idea of the speed with which they were passing were hidden from the vision.

If the Grace made the distance from Campbell's wharf to the place of collision—four nautical miles—in 45 minutes, according to Capt. Schermerhorn's time, and according to engineer Brightman's testimony, then she was running against the tide at the rate of five and one-third miles an hour with all that speed for steerage-way. If, therefore, either of the two vessels was in fault in running unduly fast in the fog, it was the Grace.

I will sign a decree dismissing the two libels as against the Luray, and allowing 21 days for appeals.

In the case of *James W. Rollison* v. *The Luray and The Grace*, the libel of James W. Rollison against both the steamers for damages, caused him by badly crushing a leg, and subjecting him to a long and painful illness at St. Vincent's hospital, a considerable loss of time, great pain and suffering, and the ultimate amputation of a leg, de-

pends substantially upon the same principles as those which determine the case of the owners of the Grace against the Luray.

The libelant, James W. Rollison, who was fireman on the Grace, certainly is entitled to recover against one or the other of the steamers; for the collision was the result of fault, and not of inevitable accident. I have stated why I think the Luray was not in fault.

I have also shown that the Grace was running at the rate, over the ground, of five and one-third miles an hour, against the tide, in full command of her steerage-way, and in a very dense fog. I am not prepared to say that five and one-third miles an hour is too fast, under all circumstances, for a steamer to run in a thick fog, but I do think that when she has full command of steerage-way, is in a fog-bank, and in a river channel somewhat narrow, that that speed is too fast. Indeed, the Grace was running over the water at the rate of six and two-thirds miles an hour, the tide setting against her at the rate of one and one-half miles an hour. This, under the circumstances, was too fast.

As to the whistle, the evidence is conclusive that the Grace was diligent in blowing it. I think it is also clear that before the Grace set out from her wharf, and before the engine and boiler were in full action, the whistle made a great noise, probably too much noise.' But after she got under way and well out on her trip,—indeed, as she was getting out into the harbor,—her whistle was condemned as defective by steam-boat men, who heard it from a greater or less distance. The testimony of the officers of the Roper, the Fairchilds, the Honing, and the Virginia, boats which she passed at different stages on her trip down the river, seems to establish the fact that the whistle did not give a proper signal, or one that could be heard and understood by vessels meeting her in a fog. The more vigorously, therefore, that she blew her whistle, the more fully she demonstrated to vessels at some distance that it was defective. The object of giving the fog-signal is to make a moving vessel's position known to other vessels in motion in the same waters; it is not to advertise to her own crew and passengers, or to people in neighboring docks, that she is at hand; it is solely to show to vessels navigating the same waters with herself her presence and position. If her whistle is insufficient to give the notice to such vessels, as that of the Grace did not do to the Honing or the Virginia or the Luray, although blown vigorously, then it was fatally defective in respect to the prime object for which it is employed in navigation, and must be condemned. When Capt. Dawes, of the Virginia, hallooed to the Grace, on discovering that the strange noise she was making was intended for a fog-whistle, that "she had better sell it and buy a fog-horn," she ought to have done at once what the Honing did,—she ought to have got in to some wharf.

Rollison is entitled, in my opinion, to recover damages from the Grace, and I do not feel justified in assessing them at less than $5,050. I will so decree, and allow 21 days for appeal.