## Graham & Morton Transportation Company v. City of Chicago.

### Gen. No. 12,334.

1. WATER WORKS—*owner of steamship held not liable for injury to.* Held, in this case, that the steamer in question was not, before the collision with the crib forming a part of the water works system in question, so negligently and improperly navigated and managed as to render the owner of such vessel liable for the resulting damage.

Action on the case for damages to personal property. Appeal from the Circuit Court of Cook County; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in the Branch Appellate Court at the March term, 1905. Reversed with finding of facts. Opinion filed April 10, 1906.

WOLSELEY & BARKER, for appellant; HENRY W. WOLSELEY, of counsel.

MICHAEL F. SULLIVAN, for appellee; JAMES HAMILTON LEWIS, Corporation Counsel, of counsel.

MR. JUSTICE BAKER delivered the opinion of the court.

Appellee, the city of Chicago, constructed in 1891 and has since maintained as a part of its system of water works, an intake crib in Lake Michigan, two miles from shore, off 68th street, and about seven miles southeast of the entrance

114 APPELLATE COURTS OF ILLINOIS.

VOL. 126.] Graham & Morton Trans. Co. v. City of Chicago.

to Chicago harbor. About one o'clock in the morning of September 8, 1901, appellant's steamer The City of Milwaukee came in collision with the breakwater surrounding said crib, and appellee contends, ran into and broke the timber of said breakwater, and to recover the damages resulting from such collision appellee brought this action on the case and had judgment for $675.90 and the defendant appealed. The declaration alleges that the plaintiff was possessed of that parcel of land underneath the waters of Lake Michigan on which said crib was; that said crib was constructed by the plaintiff as a part of its system of water works; "which said system of water works was constructed and is maintained under and by virtue of proper statutory authority," etc.; that the defendant by its servants so carelessly and negligently drove and managed said steamer that by and through such negligent conduct of the defendant, by, etc., said steamer ran into and struck said crib with great force and greatly damaged the same.

The breakwater was a six-sided structure 180 feet wide over all, made of crib timber walls placed thirty feet apart, and the space between the walls was filled with broken stone. It extended eight or ten feet above the water. The top of it was planked over. The outer walls were made of 12x12 oak timbers, joined and fastened with boiler iron. The steamer was a side-wheeler 243 feet long, 67 feet wide; her hurricane deck was about 40 feet above the water and she drew six feet two or three inches of water forward and eight feet two or three inches aft. She left St. Joseph, Michigan, for Chicago at 5 P. M. with 200 to 300 passengers and a crew of 52 persons besides the captain and mates. The air was filled with smoke from forest fires, there was a high wind from the north and northeast, and the course taken by the steamer was to the northward of the usual course to allow for leeway. At half past nine in the evening the captain supposed from the number of revolutions of the engine that he was near the west shore of the lake. The entrance to the Chicago harbor is between two piers about 400 feet apart. At the entrance to the harbor were

a government revolving light and a fog-whistle.   Because of the smoke the officers of the vessel were not able to see the government light and because of the wind and the fact that the vessel was to windward of the entrance to the harbor they were unable to hear the fog-whistle, except once for a moment, or in any manner to ascertain where the vessel was, or in what direction or at what distance from the vessel was the entrance to the harbor.

The vessel was slowed down, and towards ten o'clock a light was seen for a moment close to her, off her port bow. The steamer was turned towards the light and went as near to it as the captain deemed it prudent to go, but he was unable to ascertain what light it was, and, as he testified, as a matter of discretion and prudence, not knowing exactly where he was, he turned the steamer around, headed out into the lake and kept her headed up the lake until he saw Grosse Point light.   He then turned the steamer around, went to the southward, then to the northward and again to the southward and kept the vessel moving at half speed or less in front of the harbor until after midnight when, as he was going southeasterly, he saw to the westward at a distance of 200 or 300 feet, what proved to be a light on the 68th street crib.   He saw the light, knew that it was a light on a fixed structure and not a light on a vessel, but could not tell what structure the light was on.   The velocity of the wind was then about forty miles per hour and the smoke was exceedingly thick and heavy, so that such a light as was on the crib could not be seen at a greater distance than 400 feet.   The captain then determined to return to the light to ascertain what light it was, and so ascertain the location of his vessel.   The circumference of the circle in which the City of Milwaukee turns is three-quarters of a mile and this circle she described to the eastward of the light, and when the circle was nearly completed the collision occurred.   The crib-keeper testified that the steamer struck the southeast side of the breakwater, stem on; that the stem of the steamer broke the 12x12 timbers as one would break a pipe stem, and forced its way through the outer wall of

116    APPELLATE COURTS OF ILLINOIS.

VOL. 126.] Graham & Morton Trans. Co. v. City of Chicago.

the breakwater and back into the broken stone twelve feet and stopped. The witnesses for the defendant testified that the steamer was about 400 feet to the eastward of the crib light when that light was first seen by those on board the steamer the second time; that the engines were at once reversed and the wheel put to port; that the steamer passed to the northward of the crib and was driven southward upon the crib after she had come to a stop, by the force of the wind and waves, and struck the northern side of the breakwater.

The evidence is uncontradicted that the stem of the steamer was not injured; that the only damage sustained by her was the breaking of her wale strake, which was a line of planking forming a part of her rail, extending from the wheel house to the stem; that this wale strake was broken on the port side at a point forty feet abaft of the stem, and forward of that point was not broken or injured; that the steamer remained alongside of the breakwater about fifteen minutes, although her engines were not working and she was not fastened to the breakwater by a hawser or any other means.

Two of the witnesses for the plaintiff and one of the witnesses for the defendant were on the steamer at the time of the collision, and no one of them testified that he felt any shock or suffered any inconvenience from the collision.

If the steamer had struck the breakwater stem on, broken through its outer wall and forced her way twelve feet into the broken stone, and then stopped, her stem would certainly have been greatly damaged and injured, and the people on board of her would have been thrown violently forward. The wind was from the north and northeast and the waves, of course, ran with the wind. If the steamer came to a stop on the southeast side of the breakwater, the wind and waves would have driven her away from the crib, while, if she came to a stop to the northward of the crib, the wind and waves would carry her against the breakwater and tend to hold her there.

From the evidence we are led to the conclusion that the

steamer did not strike the southeast side of the breakwater stem on, but was driven by the wind and waves against the north side of the breakwater after she had come to a stop, or nearly to a stop.

Counsel for appellee say: "The faults charged against this vessel are, her excessive speed, not sounding the signals required by law, not having sufficient or competent lookouts, and not stopping seasonably before the collision."

It is not material to consider whether the fog-signals required by law were or were not given by the steamer; "the object of giving the fog-signals is to make a moving vessel's position known to other vessels in motion in the same waters; it is not to advertise to her own crew and passengers, or to people in neighboring docks, that she is at hand; it is solely to show to vessels navigating the same waters with herself her presence and position." The Luray, 24 Fed. 751.

The contention that the vessel had not competent and sufficient lookouts finds no support in the evidence. The captain was on the bridge all night. At midnight the second mate relieved the first mate, and from that time until the collision there were on duty, acting as lookouts, the captain, the second mate, the steward and a lookout, and all appear to have been in their proper stations and vigilant in the discharge of their duties.

There is no evidence even tending to show that anything more could have been done than was done by those in control of the steamer, to stop her or back her after the light on the crib was seen. The steamer was outside the usual anchorage grounds; was in or near the path of outcoming and ingoing vessels from and to Chicago and South Chicago harbors; was in the open lake, with a high wind from the water, and with the distance from the shore and the piers which extend into the water from the shore unknown, and we do not think that her captain was guilty of negligence in failing to stop and anchor his vessel.

The remaining contention of appellee is that the steamer was going at an excessive rate of speed as she approached

**118**     Appellate Courts of Illinois.

Vol. 126.] Graham & Morton Trans. Co. v. City of Chicago.

the crib. The captain of the steamer testified that in making the turn east of the crib, up to the time he saw the light on the crib, just before the collision, the speed of the steamer was six or seven miles per hour. No other witness, either for the plaintiff or defendant, testified that her speed exceeded six miles per hour.

An Act of Congress provides that: "Every vessel shall, in thick weather, by reason of fog, mist, falling snow, heavy rain storm, or other causes, go at moderate speed." The usual speed of the steamer was fifteen miles per hour, and she was therefore going at considerably less than half speed. The law of Congress does not attempt to fix the rate of speed at which a vessel shall go in thick weather. A vessel whose usual speed is fifteen miles per hour may well be said to be going at a moderate speed when going at six or seven miles per hour, while, if her maximum speed was nine miles per hour, such speed would not be, for her, a moderate speed. In case another vessel or obstacle is discovered in or near the course of a vessel whose maximum speed is fifteen miles per hour, when she is going six or seven miles per hour, she can, by going at full speed, turn to the right or left more quickly than can a vessel going at the same speed whose maximum speed is but nine miles per hour.

For the plaintiff one witness testified that a speed of two miles per hour would give the steamer steerage way, but he further testified that his experience had been confined to tugs, and that he had never run a passenger steamer. A tug is comparatively a small vessel, of deep draught, and her upper works extend but a few feet above the water. Here was a side-wheel passenger steamer of light draft, 243 feet long, sixty-seven wide, with cabins extending nearly her whole length, the top of which was more than forty feet above the water. Opposed to the testimony of this one witness was the testimony of the captain and other officers of the steamer, who had navigated her for years, who knew from experience what speed was necessary to give her navigator control of her in a gale

of wind and a heavy sea, and they testified that in making such a turn as she was making when the crib light was seen, in such a wind as was then blowing and in such a sea as was then running, a speed of six miles per hour was required and necessary to make her properly answer her helm, to keep her from falling into the trough of the sea, to keep control of and safely navigate her. The steamer was not, in our opinion, going at an excessive or improper speed as she approached the crib, before the collision.

The conclusion arrived at by us, that the steamer was not, before the collision, negligently or improperly navigated or managed by the servants of the defendant in charge of her, renders it unnecessary to consider the contention of appellant that, as the crib was constructed in the navigable waters of Lake Michigan, without the permission of the Secretary of War, the plaintiff could not recover for an injury to the crib done by negligence only, and that in this case there is neither allegation nor proof that the defendant intentionally injured the crib.

The judgment of the Circuit Court will be reversed with a finding of facts.

*Reversed.*