## THE ALBERTA.

*(District Court, E. D. Michigan.* February 23, 1885.)

1. COLLISION—NEGLIGENCE—EVIDENCE.
    In attempting to gather the actual facts of a collision from the contradictory testimony of witnesses, the following rules of construction should be borne in mind: (1) The testimony of the crew of each vessel, with regard to her course, and the various orders given to and executed by the wheelsman and engineer, should be credited in preference to the testimony of an equal number of witnesses upon another vessel relating to her movements as they appeared to them;

(2) the probability that a vessel, bound from one headland to another, will take the usual and direct course between them is so strong that a deviation from such course, without adequate cause, ought to be established by the clearest preponderance of evidence.

2. SAME—STEAMERS' SIGNALS—MUTUAL FAULT.

Where two steamers were navigating the most frequented waters of Lake Superior by night and in a dense fog,—one running at the rate of 10 miles, and the other at the rate of 6 miles, per hour,—and each heard several signals from the other, indicating that they were approaching each other upon opposite or crossing courses, and a collision occurred between them, *held,* that both were in fault for excessive speed.

3. SAME—DUTY TO STOP.

*Quære,* whether it was not the duty of both steamers, under the circumstances, to stop their engines until their relative positions were clearly ascertained. If not bound to stop, it was at least incumbent upon them to proceed at the lowest rate of speed compatible with the maintenance of steerage-way.

In Admiralty.

On libel and cross-libel for a collision between the steam-barge John M. Osborn and the Canadian steam-ship Alberta, which occurred about half past 9 o'clock in the evening of July 27, 1884, from eight to ten miles to the northward of Whitefish Point light, in Lake Superior. The Osborn was bound on a trip from Marquette, in the state of Michigan, to Ashtabula, in the state of Ohio, laden with a cargo of 1,120 tons of iron ore, and had in tow, with the usual length of tow-line, the schooners Thomas Gawn and George W. Davis, in the order named, both laden with iron ore.

The libel averred that about 9 o'clock in the evening, while a dense fog was prevailing, and the Osborn was proceeding at a low rate of speed, blowing her steam-whistle, at intervals not exceeding one minute, and observing all proper precautions, a fog-signal was heard from a steamer, which proved to be the Alberta, about two points off the Osborn's starboard bow; "that immediately the fog-signal was sounded by the Osborn, and she continued her course, repeating her fog-signal at proper intervals; that while thus proceeding, and several minutes after the first, the Osborn heard a second fog-signal from the Alberta, which seemed to come from a point still broader off the starboard bow of the Osborn, whereupon the Osborn starboarded one point, and sounded a distinct signal of two blasts of her whistle to indicate her course to those in charge of the Alberta, and continued thereafter to repeat the fog-signal; that no response was made by the Alberta to said signal of two blasts, nor did the Alberta sound her fog-signal except at long and unusual intervals; that the Alberta's fog-signal was thereafter sounded, and seemed to come from a point still more off the starboard side of the Osborn, and the latter gave a distinct signal of two blasts of her whistle, and continued her fog-signals as before; that no response was made by the Alberta, but the Alberta, having proceeded to a point well off on the Osborn's starboard beam, gave an imperfect, muffled sound of her whistle, and suddenly appeared through the fog close at hand; that she was then rapidly swinging to starboard across the course of the Osborn, coming at a very high rate

of speed; and, although the Osborn sounded again the signal of two blasts of her whistle, and ordered her wheel hard-a-starboard, to lessen, if possible, the effects of the collision which was then inevitable," before she had commenced to swing, the Alberta struck her with great force on the starboard side, just abaft the mizzen rigging, cutting half way through her, so that, in consequence of her injuries, the Osborn sank in about five minutes, with her cargo, and with three of her crew and a passenger of the Alberta, who was then on the Osborn, all of whom lost their lives.

The Alberta was bound on a voyage from Owen sound, on Georgian bay, to Port Arthur, on the north shore of Lake Superior, laden with passengers and a cargo of general merchandise. The case on her behalf, as set forth in the cross-libel, was that when some five or six miles to the northward and eastward of Whitefish point, and while she was proceeding slowly, and at about the hour of 10 : 15 P. M., there being a fog upon the water, and while she was sounding her proper fog-signals, the fog-whistle of another vessel was heard well off the port bow, and apparently at some distance; that in some four or five minutes afterwards the whistles were again heard, and also other whistles were heard apparently from another vessel. Both whistles were from vessels ahead, and apparently well off to port; that the Alberta was then, and for some time previously had been, running under a check in consequence of the fog, but on hearing the said whistles she immediately slowed down to not more than half speed, and was kept steadily and carefully on her course, her fog-signals continually sounding, and while she was so running the fog-signals were again heard, and broader off the port bow. Again, in three or four minutes, the whistles were heard, and almost instantly thereafter the head-light and the starboard side-light of a vessel, which proved to be the barge Osborn, were made near by, heading across the bows of the Alberta to starboard; that the engine of the Alberta was immediately reversed at full speed, but so short was the time and distance that the collision with the barge was then inevitable, and soon afterwards occurred, the Alberta striking the Osborn on her starboard side, well aft by the mizzen rigging, at something less than a right angle, etc.

*H. H. Swan* and *H. D. Goulder*, for libelant.

*W. A. Moore* and *F. H. Canfield & Cramer*, for cross-libelant.

BROWN, J. This collision was evidently caused by a misapprehension upon the part of the officers of each vessel with regard to the course of the other. The officers of the Osborn, as well as those of her schooners in tow, and the officers of the steam-barge Hecla, which was following behind her, heard, or thought they heard, the first whistle of the Alberta, from one to two points off their starboard bow, the second and third whistles still broader off, and the last one, an imperfect, muffled sound, well upon the Osborn's starboard beam. These signals indicated to them that the Alberta was on a substantially par-

allel and opposite course, and would pass safely up the lake on their
starboard hand. This theory, however, cannot be true, unless we
reject entirely the testimony of the officers and wheelsman of the Al-
berta, and believe that she was at least three points off her proper
course, and bound to some port on the south shore of the lake instead
of to Port Arthur, upon the north shore. Upon the other hand, the
officers of the Alberta heard the whistles of the Osborn apparently off
their port bow, and were so fully satisfied that each successive whistle
was broader off the port side, that, as Capt. Anderson expressed it,
"he expected to hear the next whistle abaft his beam." Yet the fact
is not disputed that the Osborn was actually crossing his bow, but it
was learned too late to avoid the disaster. Without expressing a de-
cided opinion upon the trustworthiness of the expert testimony, which
tended to show that a practiced ear can determine within a point the
bearing of a whistle in a fog, the facts of this case demonstrate that
this is a very uncertain method of ascertaining the course of an ap-
proaching vessel, when the hearer is himself upon another vessel mov-
ing rapidly in a different direction.

In attempting to gather the actual facts of a collision from the con-
tradictory testimony of witnesses it should be borne in mind: (1)
That the testimony of the crew of each vessel, with regard to her
course and the various orders given to and executed by the wheels-
man and engineer, should be credited in preference to the testimony
of an equal number of witnesses upon another vessel relating to her
movements, as they appeared to them. (2) That the probability that
a vessel, bound from one headland to another, will take the usual and
direct course between them is so strong that a deviation from such a
course, without adequate cause, ought to be established by the clear-
est preponderance of testimony. Gauged by these rules, the angle
at which these vessels approached each other is readily ascertained.
The proper course from Marquette to Whitefish point is E. ½ N., but
on account of the fog that evening, and to give the headland a wider
berth, the Osborn deviated half a point to the northward, making her
actual course, as sworn to by her officers and wheelsman, E. by N.
Upon the other hand, the compass course from Whitefish point to
Port Arthur is N. W. by W. ¼ W., but to keep clear of vessels com-
ing down the lake, Capt. Anderson ordered his wheelsman to pursue
a course N. W. ½ W. for one hour after passing Whitefish Point light.
I have no doubt the collision occurred at or very near the intersection
of these courses. As the two steamers were meeting at an angle of
only four and a half points, and the Alberta struck the Osborn at an
angle of one point greater or less than a right angle, (and whether it
was greater or less, the evidence is conflicting,) there is a difference
of from three and a half to five and a half points to be accounted for.
That the Osborn starboarded one point just before the collision is
averred in her libel, and proved by her testimony; and I have a strong
impression that the Alberta, at about the same time, ported her wheel

two or three points to give the Osborn a wider berth. It is true, her officers made no mention of this, but it is indicated by the angle at which the vessels came in contact, and also by the testimony of the Osborn's crew that the Alberta seemed to be approaching them upon a swing to starboard. The testimony of the Osborn's crew, the shape of the cut, the appearance of the Alberta's bow as she lay in the dry-dock after the collision, and the fact that the Osborn's line was snapped by the collision, all indicate that the blow was delivered from behind rather than from forward, and such I am inclined to think was the fact, although there is considerable testimony to the contrary.

If the Alberta did port in ignorance of the actual position and course of the Osborn, it was a fault for which she ought to be condemned. It is one of the elementary rules of navigation that a vessel ought never to alter her helm in ignorance of the position and course of an approaching vessel. It is true that by such change she may escape a collision, but the chances are equal that she will bring it about. Instead of experimenting, it is her duty to stop, and sometimes to re-verse. *The James Watt*, 2 W. Rob. 270, 277; *The Bougainville*, L. R. 5 P. C. 316; *The Franconia*, 4 Ben. 181, 185; *The Shakespeare*, 4 Ben. 128; *The Lorne*, 2 Stuart, Vice Adm. 177; *The Scotia*, 5 Blatchf. 227. I do not find it necessary, however, to express a de-cided opinion as to the guilt of the Alberta in this particular, since she was so clearly at fault for maintaining an excessive speed that her case is hardly susceptible of argument. She was navigating the most frequented waters of Lake Superior. Almost the entire com-merce of the lake takes its course to or from Whitefish Point light. It was night, and there was a fog prevailing so dense that the head-light of a vessel could be but dimly seen at a distance of 600 feet. The fog-signals of at least two steamers were in plain hearing, and bearing somewhat ahead. These signals indicated, in language well understood on the lake, that both steamers were incumbered by tows. All her surroundings called for the utmost caution; yet she was pro-ceeding at such a speed that the force of the collision drove her stem about half way through the Osborn, making a wedge-shaped hole 16 feet in depth, by 12 feet in width. Under these circumstances it is useless to argue that the testimony of the master and engineer of the Alberta shows that she was proceeding under a slow check. The wound itself is the one fact which outweighs all the other evidence. It can-not be argued or explained away. I am satisfied from the testimony of the experts as to the weight and momentum of the respective ves-sels that she must have been proceeding at a speed of at least 10 miles an hour. It is hardly necessary to say that this is not the mod-erate rate of speed which the rule requires.

There was an equal obligation on the part of the Osborn to maintain a moderate rate of speed. She was not only encompassed by similar perils, and warned by like signals of the approach of another steamer, but these signals indicated that the Alberta was upon her starboard

bow, and hence that if the two steamers should turn out to be upon crossing courses, it would be incumbent upon her, under the nineteeth rule, to avoid the Alberta from the moment she became visible, except, perhaps, so far as this obligation might be modified by the fact that the Osborn had two vessels in tow. It is true that she assumed that the Alberta was upon a course substantially parallel to her own, but she had no right to act upon such an assumption in disregard of the settled rules of navigation, or to the extent she might have done had the Alberta been visible and exhibiting her green light. Her running time from Marquette shows her general speed that day to have been about seven miles per hour. No order was given to run under a check when the fog arose or when the signals were first heard; and the only evidence that she was not proceeding at her usual rate is contained in the statements of the master and engineer, that the latter was instructed to let his fires run down a little, as they would necessarily be delayed until daylight in Waiska bay. This probably reduced her speed from one to two miles an hour, so that we are safe in assuming that she must have been running at from five to six miles per hour. A like rate of speed was condemned in the case of *The Colorado*, 91 U. S. 692, in which the supreme court adopted the language used by the privy council in the case of *The Batavier*, 9 Moore, P. C. 286. Indeed, the law seems to be now well settled that that is only a moderate rate of speed which will enable a steamer to be kept under ready control, and to be stopped in time to prevent a collision with other vessels, provided such vessels themselves make use of proper signals to notify other vessels of their proximity. *The Western Metropolis*, 7 Blatchf. 214; *The D. S. Gregory*, 2 Ben. 166; *The Louisiana*, 2 Ben. 371; *The Monticello*, 1 Holmes, 7. At first blush, I had some doubt whether the fault of the Osborn in this particular could be said to have contributed to the collision. The presumption is that it did. It is true that the blow was delivered by the Alberta, but this was a mere accident. If both were running at an excessive speed, the speed of both must have contributed to the collision, since if either had been proceeding at a lower rate the collision in all probability would not have occurred. While I should be unwilling to say that rule 21 absolutely demands a moderation of speed at all times and under all circumstances whenever a fog arises, the obligation unquestionably attaches whenever the signals of an approaching vessel are heard from a point where, whatever the course of such vessel may be, there is any risk of collision. It is possible that the fact that the Osborn had two vessels in tow might have relieved her of the duty of giving way to the Alberta, but it certainly did not relieve her of the necessity of so moderating her speed as to keep herself under complete control. I think she must be adjudged guilty of contributory negligence in this particular.

Indeed, I am strongly inclined to think that both these vessels were in fault for not stopping altogether and drifting until their respect-

ive signals indicated clearly that they had passed each other. In the recent case of *The John McIntyre*, 5 Asp. Mar. L. C. 278, it was held by the English court of appeal that where the officers of a steam-ship, in a dense fog, hear the whistles of another vessel more than once on either bow, and in the vicinity, from such a direction as to indicate that the other vessel is nearing them, it is their duty at once to stop and reverse her engines, so as to bring their vessel to a stand-still in the water. This was a collision between the steam-ships Monica and John McIntyre, in the North sea. The Monica was con-ceded to have been in fault. It was alleged on behalf of the McIntyre that the whistle of the Monica was heard about four points on the port bow, and then heard twice again, and thereupon the engines of the McIntyre were reversed full speed astern. The court found that this was not done with sufficient promptness, and that, from the char-acter of the blow delivered by her, the McIntyre must have been going at a considerable rate of speed at the moment of collision. The court held it to have been the duty of the McIntyre, under the circum-stances, not merely to slacken her speed, but also to stop and reverse. In delivering the judgment of the court, the master of the rolls ob-served:

"If a steamer in a thick fog—so thick that she can hardly see before her—hears another vessel in her neighborhood on either bow, not being able to see her, and she herself not going at her slowest pace, the question is whether, under those circumstances, the officer in charge of the steamer ought not to conclude that it is necessary, in order to avoid risk of collision, that he should stop and reverse? I do not hesitate to lay down the rule, not strictly as a matter of law, but as a matter of conduct, that the moment such circum-stances as these happen, it is necessary, under the article, to stop and reverse. * * * However difficult it may be for persons in command of steamers to do what the law directs, in my opinion, we must hold strictly that in a dense fog the moment another vessel is found on the bow, or in near vicinity on either bow, and she herself is going at any speed, it has then become neces-sary, under the eighteenth rule, not merely to slacken speed, but instantly to stop and reverse."

In this case the court appears to have taken a decided step in ad-vance of prior decisions, and I am not prepared to say that the rule therein laid down, in so far as it demands not only a stoppage, but a reversal of the engines, should be rigidly applied to every case of steamers meeting under the circumstances stated. At the same time, it seems to me entirely proper and reasonable to hold that when steamers are approaching each other in a fog so dense that a vessel can be seen only a few hundred feet, there is a "risk of collision" which makes its obligatory upon both to stop their engines and drift, until such risk is determined.

The case of *The McIntyre* differs from the one under consideration, if at all, only in the fact that the officers of the Osborn thought, from the signals of the Alberta, that she was upon an opposite and paral-lel course and would pass in safety. This, however, was a mere con-jecture. The officers of each vessel must have known that the other

was upon an opposite or upon a crossing course, and that there was risk of collision, until they were fully assured by the signals that each was astern of the other. So long as there was any doubt upon this subject; so long as the whistles of the other continued to be heard forward of the beam, it was their duty to act upon the supposition that there was still risk of collision, under the twenty-first rule. The following comments of the court in the *McIntyre Case* are pertinent in this connection:

"It was the whistle of the other vessel which told him, not exactly where she was, but about where she was, and that she was in a position in which he could not consider her an absolutely safe vessel in regard to him; *i. e.*, he could not consider that he had passed her or that she had passed him either ahead or astern. While he was not at once bound the moment he heard the whistle, wherever it might be, to stop and reverse his engine; but having heard the first whistle, which was about four points on the port bow, he hears another and another whistle; and I cannot help thinking that the evidence shows that it was something like three or four whistles that he heard."

Now, without expressing a decided opinion in this case, whether, under the circumstances, it was the duty of these vessels to stop and reverse, I am clearly of the opinion that it was incumbent upon them either to stop, or to proceed at the lowest rate of speed compatible with the maintenance of steerage-way.

Neither of these steamers was provided with such a lookout as the exigencies of the case required. Both of them were under charge of the master and second mate, who stood together, on the bridge in the one case, and in front of the pilot-house in the other. Neither vessel had a lookout forward or aloft, or in other position where his opportunities of observation were better than those of the officer of the deck. It was held in the case of *The Colorado*, above cited, that steamers, while navigating in dense fogs, should carry at least two lookouts, and if there had been any evidence that a want of this precaution had contributed to this collision, I should have felt bound to condemn the steamers for this omission. But as each appears to have discovered the other as soon as it was possible to do so, I am not prepared to say that either should be condemned on that account.

A decree will be entered adjudging both vessels in fault for excessive speed, dividing the damages, and referring the case to a commissioner to assess and report the same.