## THE MARTELLO.[1]

### THE FREDA A. WILLEY.

### WILLEY v. THE MARTELLO.

### WILSON et al. v. THE FREDA A. WILLEY.

*(District Court, S. D. New York. February 24, 1888.)*

1. COLLISION—FOG—RATE OF SPEED—STEAMER NEAR PORT OF NEW YORK.

   For a steamer whose full speed is twelve knots, and which is near the entrance to the harbor of New York, in a thick fog, a speed of about five knots is not the "moderate speed" required by article 13 of the new international rules; and she is bound to stop at once on hearing a fog-horn *near*, and nearly ahead.

2. SAME—SAILING.

   A sailing vessel in a fog, and in a situation where many other vessels are likely to be met, is bound to moderate her speed to the limits of fair steerage-way. *Held*, in this case, that four knots was immoderate speed in a sail-vessel approaching New York harbor in a thick fog.

3. SAME—BETWEEN STEAM AND SAIL—FOG—"MODERATE SPEED"—SIGNAL WHISTLES OPTIONAL—APPORTIONMENT.

   In the midst of a thick fog the steamer M., outward bound from New York, and a few miles outside of Sandy Hook, was steaming about five knots an hour, headed E. S. E. The barkentine W., headed north, and bound into the port of New York, was sailing about four knots, with the wind E. by N. The fog-horn of the W. was first heard by the steamer off her starboard bow, and afterwards, and as soon as the barkentine came in sight, which was at a distance of from 250 to 700 feet, according to the steamer's witnesses, the steamer was stopped and backed. The sailing vessel had about three-fourths of her canvas set; she made no effort to slacken her speed or do anything to avoid collision, at any time, though the whistles of the steamer were heard coming nearer. The barkentine was struck by the steamer on her port bow. *Held*, both in fault, for the rate at which they were moving in the fog, under the special circumstance of the immediate vicinity of the entrance to New York harbor, where other vessels were to be expected. *Held, further*, that the barkentine was in additional fault for failure to check her speed on hearing the approaching whistles of the steamer; and the steamer in additional fault for not stopping as soon as the sailing vessel's horn was heard; but not in fault for not indicating her course by whistles.

In Admiralty. Libels for damages.

*Foster & Thompson*, for the Martello.

*Goodrich, Deady & Goodrich*, for the Willey.

BROWN, J. On the 8th of May, 1887, the steamer Martello of the Wilson line, 370 feet long, and 2,439 net tons, bound from New York to Hull, came into collision, a little before 8 o'clock in the morning, a a few miles outside of Sandy Hook, with the barkentine F. A. Willey, bound from Pensacola into the harbor of New York. At the time of the collision, a thick fog prevailed. The wind was about east by north, and the barkentine headed north, on her starboard tack. The steamer was heading E. S. E., and struck the barkentine on her port bow, crushing in her timbers, and bringing up against the keel and bowsprit,

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

which were knocked to starboard. The injuries to the Martello were comparatively slight. The above cross-libels were filed by the respective owners to recover their damages, each alleging that the other was going at too great speed in a fog, and did not maintain a proper lookout. The Willey also charges as a fault against the Martello that she did not indicate by her whistles which way she would turn, and the steamer also charges that the Willey did not properly sound her fog-horn.

It is impossible to hold the collision in this case the result of inevitable accident. The circumstances are not sufficient to show that it could not have been avoided by the use of reasonable prudence, diligence, and nautical skill. *The Morning Light*, 2 Wall. 550, 558. The case is, however, somewhat peculiar, in that both vessels were going at a comparatively low rate of speed; less than has usually, in cases of collision in a fog, been found to have been the speed of one or the other of the vessels. Each side accordingly claims that the speed of its own vessel was within the limit required by the rules of navigation; and each, no doubt, in this respect, makes a somewhat close case. Upon repeated consideration, however, I am satisfied that neither vessel discharged her whole duty in this respect, having reference to the special circumstances of the situation. The speed of the Martello is to be deduced partly from the direct testimony, and partly from the distance run, and the time that elapsed after discharging the pilot a little to the westward of the perch and ball buoy until the collision. On this subject there is a great amount of testimony; and in the latter stages of the cause an endeavor was made on the part of the steamer to weaken the force of the previous evidence of her officers, and of the entries in the engineer's log, as well as the private entries of Maider, the second engineer. There is nothing that I can find, however, in this later evidence, that deserves any greater confidence than the testimony previously given, and the entries referred to, which are verified with perfect clearness and positiveness by the witness who made them at the time. The case, on the part of the steamer, is, in many respects—such as the alleged errors of the log, the alleged dead slow speed, the need of keeping steerage-way, and her being nearly stopped at the collision—similar to that of *The Dordogne*, 10 Prob. Div. 6, in which the steamer was held liable. In that case, however, there were some circumstances favorable to the steamer that are not found here. Without discussing the details of the evidence, the most reliable testimony, including that of the master, satisfies me that the pilot was discharged at least half a mile to the westward of the perch and ball buoy, *i. e.*, about north from the black buoy No. 1; that the engine was stopped at 7:03 A. M., for the purpose of slowing the vessel until the pilot could be discharged; that the pilot left, and the engines were again moved slow ahead, at 7:10; that the place of collision, best fixed by the pilot Wolff, was one and three-fourths miles from N. to N. N. E.,—say about N. by E. from Sandy Hook light-ship, —and upwards of four knots from the point where the pilot was discharged; that at 7:50—40 minutes after the pilot was discharged—the engines were ordered full speed astern, when the barkentine was first

seen from 600 to 1,500 feet distant; and that the engines continued full speed astern till about 7:56, soon after the collision; were then slowed, and were stopped at 7:58. This would make the speed of the steamer, when first seen, from five and a half to six knots. Again, the full speed of the steamer was about 12 knots, with about 58 revolutions. The engineer testifies that at 7:10, when moving slowly ahead, she was put at 28 revolutions, and at 7:20, when ordered to go as slow as possible, the engines were put at 24 revolutions. As the "slip" is less when the vessel is running at slow speed than when running at high speed, 24 revolutions should, I think, give a little over 5 knots. White, Nav. Arch. 548. From the second engineer's entries, moreover, and from the estimates of the witnesses, it would appear that the engine must have been backing full speed for about two minutes before the collision. The estimated time from the order to reverse to the collision is put at not less than from two and a half to three and a half minutes. As this was a new steamer with all the modern appliances, "her gear working quick," no such length of time for getting the engine reversed after the order to reverse was given, can be admitted, as was estimated upon the evidence in the case of *The Lepanto*, 21 Fed. Rep. 651, 653. One-third of a minute is more than sufficient in a steamer having the modern appliances, assuming a reasonably prompt obedience to orders, and that the vessel was running "slow." No delay in reversing fully and at once is in that case necessary. Had the steamer not been going over four knots when the order to reverse was given, and if that order was properly obeyed, she would have been very near if not quite at a dead stop at the time of collision. See *The Aurania*, 29 Fed. Rep. 121, note. It is not claimed that she was wholly stopped, and the depth of the wound in the bow of the Willey, and the great swing of the Willey's bows to the southward, are sufficient evidence to the contrary. Mr. Wolff, the expert and mechanical engineer, estimated the speed of the Martello at the collision at not over two knots. Upon all the other testimony, I should arrive at about the same conclusion, and such is the first officer's estimate. I do not regard that speed as insufficient to cause the injuries proved to have been inflicted upon the Willey. The length of time that she was backing without reducing her speed below two knots at the moment of collision is strong corroboration of what is to be inferred from the other testimony, that she was going from five to five and a half knots when the order to reverse was given. The pilot, Wolff, who was acquainted with the handling of the steamer, testifies that if previously going only five knots, and if her full speed were twelve knots, she would be stopped dead on reversing the engines full speed in going from 200 to 250 feet. If this estimate is accurate, the steamer would have been backing full speed only about one minute. I think the estimate too small, and that she was backing from a minute and a half to two minutes, reducing her speed from about five or five and a half knots to about two knots in going from one to two lengths. I cannot hold a speed of about five knots under the special circumstances of this case to be such "moderate speed" as to free the steamer from blame. There was special need of very great

caution; because the steamer's course in that vicinity, only a short distance outside of the bar, was likely to encounter incoming vessels, and because the lightening up on the morning of the 8th of the fog which had prevailed the previous day, was likely to bring many vessels near the entrance of the harbor; and the horns of other vessels were in fact heard. It had been clear in the morning, but had again shut down thick soon after the pilot left, about 40 minutes before the collision. The engineer, indeed, says that the Martello had only steerage-way, but he was not the proper officer to testify to such a fact; and from his own testimony it appears that the engine could have been run more slowly than 24 revolutions. If the fog was so thick that the Willey could not be seen more than from 250 to 700 feet, as most of the Martello's witnesses testify, her speed was not "moderate," within the decisions; because she could go slower, and it was impossible, with that speed, to avoid any approaching vessel within that distance. *The Colorado,* 91 U. S. 692; *The Pennsylvania,* 19 Wall. 133; *The Nacoochee,* 22 Fed. Rep. 855, 28 Fed. Rep. 462; *The Pottsville,* 12 Fed. Rep. 633; *McCabe* v. *Steam-Ship Co.,* 31 Fed. Rep. 234.

In the thick fog that prevailed, and in the expectation of vessels approaching New York harbor, which ought to have been anticipated, it was the further duty of the steamer to stop her engines at once when the fog-horn of the Willey was first heard off her starboard bow. From the direction of the wind it was to be inferred that the sailing vessel whose horn was heard was probably crossing the steamer's course. It was plain that the horn could not be far off. Until the position and course of the vessel whose fog-horn was heard near were definitely known, it was incumbent on the steamer to stop her engines, and to do so at once. *The Lepanto,* 21 Fed. Rep. 651, 659; *The George D. Fisher,* 21 How. 1, 6; *The City of Atlanta,* 26 Fed. Rep. 461, 462, and cases there cited; *The Ebor,* 11 Prob. Div. 25; *The Frankland,* L. R. 4 P. C. 529, 533, 534; *The Dordogne,* 10 Prob. Div. 6. In the case of *The Ebor,* the steamer, though going at the rate of from three to three and a half knots only, was held in fault because she did not stop at once on hearing the first signal from the other vessel. According to the testimony of the witnesses for the Martello, the time was doubtless quite short between hearing the first horn from the Willey and her coming into view. But it is evident that there was some interval. The lookout of the Martello in the crow's nest, and one of the men on the forecastle estimate it at least one minute. The master, and the first mate who was on the forecastle, both heard the horn; but it is clear that the orders "hard a-port," and "reverse the engine," were not given until after the mate had *seen* the Willey on the starboard bow, and ordered hard a-port. Both were asked what they *did* upon hearing the horn; and the answer is only as to what was done after the Willey was *seen,* when the mate's order was given immediately. In another place the mate says: "I sung out the fog-horn first; and, as she came in sight, I sung out, 'hard a-port.'" All these circumstances point to a very appreciable interval after the fog-horn was heard near and "nearly ahead," as one of the witnesses says, and before the order to stop was given. It

appears further on cross-examination that the two men on the forecastle with the mate were more or less engaged in overhauling the chain and anchor, which the first officer was superintending. This circumstance, together with the very much less distance at which they estimate the Willey when first seen, than the estimate testified to by all the Willey's witnesses, afford ground to doubt whether as sharp a lookout was kept as was required. Upon these various considerations, the Martello must be held to blame.

2. The Willey's speed was estimated by the Martello's witnesses at five knots, but by her own witnesses at only four. The latter are sustained by the rate given by the patent log. The breeze, it is true, was estimated as a five or six knot breeze; but the Willey was well loaded, and had only about three-fourths of her canvas set, it having been reduced by hauling up the foresail as the breeze freshened. I think that she was not making much, if any, over four knots. By article 13 of the new international rules, the duty to go at "moderate speed" in a fog is imposed equally upon sailing ships and on steam-ships. "Every ship," says the rule, "whether a sailing ship or a steam-ship, shall, in a fog, mist, or falling snow, go at moderate speed." Prior to the adoption of this article the duty of sail-vessels to slacken speed in a fog or in thick weather had been recognized and enforced as a rule of prudent navigation. In the case of *The Johns Hopkins*, 13 Fed. Rep. 185, where, upon a collision in a fog between a steamer going at three and one-half knots and a sailing vessel going twice as fast, the collision was held solely the fault of the sailing vessel. It was also applied in this court in the case of *The Rhode Island*, 17 Fed. Rep. 554, where the schooner was held in fault for sailing in Long Island sound in a fog at the rate of seven knots. In navigation in the open sea or on the lakes, where other vessels are not to be specially looked for, a rate of four knots for a sail-vessel has been held not a fault. *The Colorado*, 91 U. S. 692; *The Leland*, 19 Fed. Rep. 771. In *The Elysia*, 4 Asp. 540, a speed of five and one-half knots in a fog, it is said, would not be moderate. In *The Zadok*, 9. Prob. Div. 114, a speed of five knots was held not moderate speed in a fog in the English channel. In *The Victoria*, 3 W. Rob. 49, a speed of six knots in a dark night without fog was held immoderate. The same in *The Pepperell*, Swab. 12. In all these cases the sailing vessel was held bound to heed all the special circumstances of danger, and to moderate her speed accordingly. In the case of *The Zadok, supra*, Sir JAMES HANNEN, the president of the admiralty division, held it the duty of the sailing vessel in a thick fog to moderate her speed down to the standard of sufficient way to control her movements,—"to as low a rate as is consistent with keeping a good steerage-way." This duty was affirmed by Lord ESCHER in the court of appeal in the case of *The Dordogne*, 10 Prob. Div. 6, 12, where he says: "As the steamer, by her whistles, is perceived to be coming nearer in a fog, the sailing vessel ought, if she is under full sail, to take sail off, until she brings herself as nearly to a stand-still as is possible whilst being under command." In *The Ebor* and other cases, *supra*, similar language is used as to the duty of steamers.

In the present case the circumstances above referred to required special caution on the part of the sailing vessel as well as of the steamer. The speed which would have been moderate and justifiable farther out at sea, was imprudent in a thick fog, just outside of New York harbor, at a time and place when many other sailing vessels were to be expected to be approaching, and steamers to be departing upon courses crossing the Willey's at nearly right angles. The Willey had about three-fourths of all her canvas set. She had by no means brought her speed "down to the standard of good steerage-way." On the contrary, she was going at nearly full speed. She hauled up her foresail a while before, not to diminish her speed, but to avoid increasing it, as the breeze was freshening. Four knots for her was equivalent to eight knots for the steamer, relatively to her maximum speed, as well as to her ability to keep out of the way of other vessels that she might be bound to avoid. Two such sail-vessels crossing at her speed in such a fog would be likely to come in collision in spite of anything that either or both could do after they had sighted each other. Such navigation was not prudent or reasonable, and therefore not "moderate" in a situation where many other ships,— sail-vessels as well as steamers,—were likely to be met, some of which it might be her duty to avoid. She was bound, in such a place, to moderate her speed within the limits of fair steerage-way, so that she could do her share in avoiding collision after the danger of it was perceived. As observed in the case of *The Rhode Island*, 17 Fed. Rep. 554, 559, if the speed of the sailing vessel would not be prudent or justifiable or moderate, as respects other sailing vessels that she was likely to meet, and out of whose way she would be bound to keep, the same rule must be applied, and her speed be held not moderate, though the other vessel be a steamer. Though she may have the right of way, she has no right to increase the burden that falls on the steamer to keep out of the way.

It was a fault in the Willey that, after hearing the steamer's several whistles coming nearer, she did not even then take any steps to check her speed or do anything to avoid collision. In the case of *The Zadok*, 9 Prob. Div. 117, Sir JAMES HANNEN says:

"Though the whistle of the Iduna was heard once, and twice, and thrice, yet no precaution whatever was taken on board the Zadok to guard against a contingency which she was warned might happen of a steamer being in a position which required caution. I am advised that what ought to have been done was this: that men should have been stationed so as to work on the braces, and put the foresail aback, by letting them fly; they would come at once aback, and would tend to throw off the ship's head, by putting the helm to starboard; and, when the vessel was seen, * * * there would have been time for them to effectuate that maneuver, which might have had the effect of avoiding the collision altogether. Instead of that, no preparation was made to do anything on board the Zadok. Those on board seem to have thought that she, being a sailing vessel, and the other being a steamer, the former had a right to keep her course, and do nothing. That is not the view I take, nor the view which I am advised should be taken."

These observations are in the main applicable to the present case; and as respects the right of the sail-vessel to hold her course, as against a

steamer, the supreme court in *Peck* v. *Sanderson*, 17 How. 178, 182, say:

"Where, as in the present case, they are brought suddenly and unexpectedly close to each other, and the ordinary rules of navigation will not prevent a collision, it is the duty of each to act according to the emergency, and to take any measure that will be most likely to attain the object."

The master states that he would have ported his helm, and could have avoided this collision, if the steamer had given him their signal whistles to indicate that she was backing; and it is charged as a fault against the steamer that she did not give these signals. But, as article 19 of the new regulations expressly declares that the "use of these signals is optional," it is not in itself, independently considered, a fault that they were not given. Notwithstanding the fact, however, that the signals are made optional, when their great utility in promoting a mutual understanding between a steamer and a sailing vessel comes to be better understood, it may then be a legal duty on the part of the steamer, as one of the obligations of reasonable prudence, to give those signals, whenever the situation is such that the steamer cannot alone avoid collision, and when the steamer knows, or ought to know, that the other vessel, guided by such signals, but not without them, might safely change her course so as to avoid disaster. I do not need to pass on that question now. In the situation of these two vessels, the master of the Willey, without knowing whether the steamer intended to go ahead of him or astern, or even whether she had reversed her engines, (in which latter case the steamer could not materially change her course,) could not prudently change his own course in time to be of any service. I cannot, therefore, hold the Willey in fault on that ground. The cases in which steamers fail to hear the fog-horns of sailing vessels until quite near are too frequent to warrant the inference that the horn was not properly blown, because not sooner heard. For the Willey's speed, however, in that situation, and for her failure to attempt to check it after the approaching whistles of the steamer were several times heard near in the thick fog, I must hold her to blame; and the damages and costs must, therefore, in both cases be divided.