In re CLYDE S. S. CO.

In re OLD DOMINION S. S. CO.

(District Court, S. D. New York. December 7, 1904.)

**1. COLLISION—STEAMSHIPS—EXCESSIVE SPEED IN FOG.**

Six knots is an excessive speed for a steamship in a thick fog in a frequented part of the ocean, and charges the ship with fault where a collision occurs.

**2. SAME—NAVIGATING IN FOG—VIOLATION OF SIXTEENTH ARTICLE OF INTERNATIONAL RULES.**

A steamship must be held in fault for a collision with another in a fog, notwithstanding the clear fault of the latter in running at an excessive speed, where she was likewise maintaining an excessive speed, and also violated article 16 of the international navigation rules (Act Aug. 19, 1890, c. 802, 26 Stat. 326 [U. S. Comp. St. 1901, p. 2868]) by failing to stop her engines on hearing the fog signals of the other vessel apparently forward of her beam.

**3. ADMIRALTY JURISDICTION—DEATH BY WRONGFUL ACT ON HIGH SEAS—ENFORCEMENT OF STATE STATUTE.**

A suit may be maintained in a court of admiralty to recover damages from a vessel at fault for a collision on the high seas for loss of life resulting from the sinking of the other vessel, where a right of recovery for wrongful death is given by the statutes of the state in which both vessels belonged, both being a part of the territory of such state and subject to its laws.

In Admiralty. Petitions for limitation of liability for collision.

Wing, Putnam & Burlingham, for Old Dominion S. S. Co.

Robinson, Biddle & Ward, for Clyde S. S. Co.

Convers & Kirlin, Hunt, Hill & Betts, Wing, Putnam & Burlingham, Butler, Notman, Joline & Mynderse, Robinson, Biddle & Ward, Francis D. Winston, Arthur L. Fullman, John R. McMullin, Norman B. Beecher and A. Leo Everett, for various claimants.

ADAMS, District Judge. These petitions for limitation of liability on the part of the Old Dominion Steamship Company and the Clyde Steamship Company, were the result of a collision which occurred in the Atlantic Ocean near the Winter Quarter Shoal Lightship, off the coast of Virginia, about 7 miles at sea, on the 5th day of May, 1903, in the early morning, between the steamships Hamilton and Saginaw, owned by the respective petitioners. As usual in such cases, it was sought, in the beginning, to contest, as well as to limit, liability, and each vessel charged the other with faults alleged to have produced the collision. A dense fog prevailed at the time.

The Hamilton, about 300 feet long and 40 feet beam, left New York on the 4th day of May, 1903, about 3 o'clock P. M. bound for Norfolk, Virginia. At the time of leaving the weather was fine, but about 8 o'clock a thick fog set in, and she reduced her speed slightly. At practically the same time she started her automatic electric whistle, which was blown at intervals of about 54 seconds. When the Delaware Lightship was passed at 11:35 P. M., the fog was dense and it continued so until after the collision.

The Saginaw, 238 feet long and 38 feet beam, left Norfolk, Virginia, the 4th day of May about 6:30 o'clock P. M. bound for Philadelphia. She ran into the fog about 1 A. M. of the 5th and continued her full speed of about 9½ knots until a few minutes after 4 o'clock when, according to her contention, the fog first became dense. She then reduced her speed to some extent, not by orders by means of the Telegraph but by verbal directions through the speaking tube, running from the pilot house to the engine room, to slow the engine and let her steam run down. These orders were obeyed and she contends that they had the effect of reducing her headway at the point of collision to between 5 and 6 knots per hour.

The collision occurred at 4:44 or 4:45 o'clock A. M. about 2¾ miles S. S. E. of the Winter Quarter Lightship, the stem of the Hamilton striking the port side of the Saginaw about 30 feet from the stern and cutting off a portion of the stern, the direction of the blow extending aft. The course of the Hamilton prior to reaching the immediate vicinity of the collision was about South-west ½ South and that of the Saginaw North-east by North. Both vessels had for some time been sounding fog whistles and, prior to the collision, had heard the other's blasts. The Saginaw sank almost immediately and became a total loss, with some loss of life, personal injuries and damage to cargo. The Hamilton's stem was twisted slightly to port but she was not materially injured and after picking up such of the survivors as could be found, after due search, proceeded on her voyage.

The Hamilton was proceeding down the coast in a fog at about two-thirds of her full speed of 14 knots and candidly admits that she was in fault for excessive speed.

The other faults charged against her of not sounding the signals required by law; not having any competent lookout; having a defective reversing gear; and in not stopping and backing seasonably before the collision are not, apparently, sustained by the evidence but her excessive speed is enough to condemn her and consideration of the other alleged faults is not required.

The charges of fault against the Saginaw are: in not sounding the signals required by law; at proceeding at an immoderate speed in fog; in not having any competent officers in charge or any sufficient lookout; in not slowing, stopping and backing when the whistles of the Hamilton were heard; in not keeping her proper course; in porting her helm, and not taking any timely or seasonable precautions to prevent the collision.

The Saginaw strenuously contends that her own speed was not excessive, but if it was so, it was not contributory to the collision, which can be fully accounted for by the Hamilton's fault in that particular, citing The Umbria, 166 U. S. 404, 17 Sup. Ct. 610, 41 L. Ed. 1053, where it was held in a collision case between that vessel and the Iberia, that the faults of the Umbria were so gross that the rule regarding any doubt as to the management of the other vessel, should be resolved in her favor.

The facts here appear to be that prior to the collision the Saginaw had been running for more than 30 miles in a dense fog under full speed bells and that, while so continuing, there was some reduction of

speed, when near the point of collision, by the said directions to that effect through the speaking tube. She was probably going 6 knots, at least, at the time of contact. That rate of speed or even less in thick fogs in a frequented part of the ocean, as this was, has been frequently condemned. The Pottsville (D. C.) 12 Fed. 631; The Luray (D. C.) 24 Fed. 751; The Oregon (D. C.) 27 Fed. 751; The Magna Charta, 1 Asp. Mar. Cas. 153; The Raleigh (D. C.) 41 Fed. 527; Id. (C. C.) 44 Fed. 781; The Martello (D. C.) 34 Fed. 71; Id. (C. C.) 39 Fed. 507; Id., 153 U. S. 64, 14 Sup. Ct. 723, 38 L. Ed. 637; The Colorado, 91 U. S. 692, 23 L. Ed. 379; The Michigan, 63 Fed. 280, 11 C. C. A. 187; The City of New York, 8 Blatchf. 194, Fed. Cas. No. 2,759; The Alberta (D. C.) 23 Fed. 807, 813; Watts v. U. S. (D. C.) 123 Fed. 105, 112.

Moreover, she failed to observe the 16th Rule for preventing collisions at sea, providing:

"A steam vessel hearing apparently forward of her beam, the fog signal of a vessel the position of which is not ascertained shall, so far as the circumstances of the case admit, stop her engines and then navigate with caution until danger of collision is over."

Prior to the Act, containing this rule (Act Aug. 19, 1890, c. 802, 26 Stat. 326 [U. S. Comp. St. 1901, p. 2868]), going into effect, under the general rule relative to vessels meeting in fog, with risk of collision, it was held that when a whistle was heard a few points on either bow, a steamer should stop and, if necessary, reverse, until the exact position and course of the other vessel could be ascertained. The North Star, 62 Fed. 71, 10 C. C. A. 262, and cases cited. Under the Act now in force, a failure to observe this precaution creates a presumption of fault. The Bernard Hall, 9 Asp. Mar. Cas. 300; The Koning Willem I., Id. 425. In the latter case, it was said by Bucknill, J. (427):

"The question remains whether the Koning Willem I. is also to blame. The reason given by her master for not stopping his engines when he first heard the whistle of the Bittern, or at the second or third whistle, was this—that his ship was going so slow, and the signal seemed to be so far off that he thought it better to wait until he heard it again, and that so soon as he heard it more ahead—that is, finer on the bow—he stopped his engines immediately. Not having ascertained the position of the Bittern when her signals were first heard, in my opinion the engines should have been stopped, apart altogether from art. 16, but certainly in accordance with that article. I think, and the Elder Brethren of the Trinity House who assist me agree, that it was in that weather impossible to have ascertained with any degree of certainty the position of the Bittern—that is, the bearing and distance of the Bittern from the Koning Willem I.—when her whistle was first heard, and the master of the Koning Willem I. admits as much himself. I think his duty was, clearly, to have stopped his engines then. With regard to what has been said about signals in a fog, I think I may usefully read part of a paragraph in art. 18 of the Channel Pilot, part 1, 9th edit.: 'Sound is conveyed in a very capricious way through the atmosphere. Apart from wind, large areas of silence have been found in different directions and at different distances from the origin of a sound, even in clear weather. Therefore too much confidence should not be felt in hearing a fog signal.' Now I will refer to the judgment of the President in the case of The Bernard Hall (ubi sup.), the language of which I adopt. The learned President said: 'The Elder Brethren point out that there would be extreme difficulty in knowing how far off the vessel would be in a fog, and therefore they do not think there was any such ascertainment as to justify the Holyrood'—in this case the Koning Willem I.—'in not complying with the clear terms of art. 16, by

stopping her engines when she first heard the whistle of the Bernard Hall; and that it is impossible to say that it would not have been a material matter if she had done so.' Each case must, no doubt, be considered on its own facts; and in this case I hold without doubt that the master of the Koning Willem I., a man of great experience, should have grasped the fact that, as it was impossible for him to locate with any certainty in that dense fog the bearing of the Bittern or her distance away, he should have stopped his engines on first hearing her whistle. Instead of that, he waited until he found that the whistles indicated danger, because he heard them drawing ahead, proving that the Bittern was crossing his bows. So, in this part of the case, there has been a breach of the second part of art. 16. As has been pointed out to me by the Elder Brethren, if you stop your engines you can hear better than you can when the noise of the engines and propeller is going on. If you stop your engines you lessen the danger and give yourself better information than if you go on with engines moving, as was done in this case; and it may be that if the master of the Koning Willem I. had stopped his engines when he first heard the whistles, which he thought were far off, he might have come to the conclusion that the whistles were nearer than he thought they were—and I suspect they were nearer. I think it was negligent navigation on his part not to have stopped his engines when he first heard the whistle of the Bittern and to have waited so long as he did."

The Saginaw did not stop when the whistles of the Hamilton were heard nearly ahead, or not more than a half a point on her own port bow, but she kept going ahead under the same speed. The master left the pilot house and went forward to be able to see better as the vessel was high out of water at the stem, on account of having only a part of a cargo, which caused the bad trimming. When then the Hamilton appeared slightly over the port bow of the Saginaw, the master of the latter ordered the helm to be ported in the hope of escaping the collision.

The case now under consideration is readily distinguishable from The Umbria. There the principal fault was clearly with the Umbria and the only question to be determined with respect to the Iberia was, whether she was guilty of a legal fault contributory to the collision. It was held to be doubtful, in view of the Umbria's movements, and, under the rule adverted to in that case, the Iberia was discharged. Here, the faults of the Saginaw are, at least, equal to those of the Hamilton and would seem to be greater in that the Saginaw's speed was also excessive and she violated the 16th rule of navigation after the presence of the other vessel was discovered. The Hamilton in such respect was apparently without fault, as she stopped her engines when the other's whistles were heard and reversed, although without much effect in view of her previous speed.

The right of the petitioners to limit their liability is not seriously contested. The interest of the Old Dominion Steamship Company, with pending freight and passage money, has been reported to be $318,-373.78, and of the Clyde Steamship Company to be $531.90. A reference will be necessary to ascertain how the aggregate of these funds should be distributed among the various claimants. In that connection, a question has arisen with respect to the legal right of recovery of damages for loss of lives of several persons on the Saginaw, who were said to have been drowned in consequence of the collision. Such right has been vigorously disputed by the claimants of the vessels and before the cases go to a commissioner, it is necessary to determine the question. These persons were: Mary Eliza Jones, passenger; Alfred

Gilmore, passenger; Edward S. Goslee, Chief Officer; Mary Hawley, passenger; Laura Hawley, passenger; William Morris, steward; Edmund Page, second cook; Peter Swanson, passenger.

The question of liability for loss of life on the high seas is admittedly a new one. I have been referred to a number of cases bearing indirectly upon it, but to none which can be regarded as an authority for the determination of the controversy. The general principle undoubtedly is that without the aid of a statute there can be no recovery in such cases (The Harrisburg, 119 U. S. 199, 7 Sup. Ct. 140, 30 L. Ed. 358; The Alaska, 130 U. S. 201, 9 Sup. Ct. 461, 32 L. Ed. 923), but to meet that objection the claimants invoke the aid of the Delaware statute providing:

"Section 1. That no action hereafter brought to recover damages for injuries to the person by negligence or default, shall abate by reason of the death of the plaintiff; but the personal representatives of the deceased may be substituted as plaintiff and prosecute the suit to final judgment and satisfaction.

Section 2. Whenever death shall be occasioned by unlawful violence or negligence, and no suit be brought by the party injured to recover damages during his or her life, the widow of any such deceased person, or if there be no widow, the personal representatives may maintain an action for and recover damages for the death thus occasioned.

Passed at Dover, January 26, 1886."

13 Del. Laws 1866–67, pp. 28, 29, c. 31.

That act was amended March 9, 1901, as follows:

"Section 1. That Section 2 of Chapter 31, Volume 13, of the Laws of Delaware, entitled 'An act in relation to injuries or death occasioned by unlawful violence or negligence,' passed at Dover, January 26, 1866, be and the same is hereby amended by striking out all that part of said Section after the word 'Widow,' in the third line, and inserting in lieu thereof the following 'or Widower of any such deceased person, or if there be no widow or widower the personal representatives may maintain an action for and recover damages for the death and loss thus occasioned.'

Approved March 9, A. D. 1901."

31 Del. Laws 1901, p. 500, c. 210.

It appears that the owners of the vessels were corporations existing under the laws of the State of Delaware and the contention is that the steamships are, therefore, portions of the territory of that State and subject to its laws. The Scotia, 14 Wall. 170, 184, 20 L. Ed. 822; Crapo v. Kelly, 16 Wall. 610, 21 L. Ed. 430; Wilson v. McNamee, 102 U. S. 572, 26 L. Ed. 234; The Lamington (D. C.) 87 Fed. 752, 754; International Nav. Co. v. Lindstrom, 123 Fed. 475, 60 C. C. A. 649.

On the other hand the claimants contend that the question presented is, can there be a recovery in admiralty for loss of life upon the high seas where there is no element of contract involved, and argue that the actions having been brought against the Hamilton alone, any recovery must necessarily rest upon the theory of a maritime tort, committed by an outside colliding vessel and that the court is without jurisdiction in the premises. The argument made is ingenious and receives some support from the authorities cited: Rundell v. La Compagnie Generale Transatlantique (D. C.) 94 Fed. 366, affirmed 100 Fed. 655, 40 C. C. A. 625, 49 L. R. A. 92. It is urged that the fiction of a merchant ship being regarded as a floating portion of the country to which she be-

longs, should not be unduly extended, citing Hall's Treatise on International Law, 1904, pp. 249, 250 and that the theory applicable to merchant vessels must be one of contract. Lloyd v. Guibert (1865) 1 Q. B. 115; The Gaetano and Maria, L. R. 7 P. D. 137–146. It is further urged that in England admiralty has no jurisdiction for loss of life (notwithstanding Lord Campbell's Act). The Vera Cruz, 10 App. Cas. 59. Many authorities are cited to establish that in cases of tort upon the high seas, the admiralty courts of the United States will be governed by the general maritime law, which must be uniform, and it is further urged that uniformity in admiralty will be destroyed if the various state statutes are enforced. The Scotland, 105 U. S. 24, 26 L. Ed. 1001; The Belgenland, 114 U. S. 355, 5 Sup. Ct. 860, 29 L. Ed. 152; The Brantford City (D. C.) 29 Fed. 373; Benedict's Admy. §§ 74, 111; The Vera Cruz, supra; The Harrisburg, supra; Crapo v. Allen, 6 Fed. Cas. 763; The Manhasset (D. C.) 18 Fed. 918; Workman v. Mayor, 179 U. S. 552, 21 Sup. Ct. 212, 45 L. Ed. 314.

There can be no doubt that natural justice requires that compensation should be made for loss of lives through negligence upon the high seas as well as upon land, where it is generally obtainable. In the Lindstrom Case (C. C.) 117 Fed. 170, Judge Thomas gave the matter careful consideration and concluded that there was jurisdiction in the United States Circuit Court to grant compensation for an injury causing death on the high seas. He held that the steamship there, though without the actual limits of the state, was nevertheless a part of the territory of the state of New York and that all civil rights of action were determined by the laws of such state. This was reversed by the Circuit Court of Appeals on the ground that the vessel belonged in New Jersey, and as under the law of that state, the action was not brought within a year, as there provided for, no recovery could be had. Judge Wallace, in writing for the Circuit Court of Appeals, said (123 Fed. 475, 476, 60 C. C. A. 649, 650):

"The territorial sovereignty of a state extends to a vessel of the state when it is upon the high seas, the vessel being deemed a part of the territory of the state to which it belongs; and it follows that a state statute which creates a liability or authorizes a recovery for the consequences of a tortious act operates as efficiently upon a vessel of the state when the vessel is beyond its boundaries as it does when it is physically within the state. The inquiry in the present case, therefore, is whether a recovery was authorized by the statute of the state whose territorial sovereignty embraced the steamship. The action was brought upon the theory that the steamship was a vessel of New York, and seems to have been decided at the trial upon that theory. The complaint alleged that the death of the intestate and the negligence occurred upon a vessel of that state, and that the plaintiff was entitled to recover by virtue of the statute of New York in such case made and provided. Upon the trial the plaintiff was granted leave to amend the complaint by alleging that a statute of New Jersey provides that the administrator may recover for the benefit of next of kin 'in practically the same manner as the statute of New York,' but leave was not granted to amend by alleging that the steamship was a vessel of New Jersey. The complaint was not formally amended, and the trial judge treated the case as founded on the statute of New York."

In the case of McDonald v. Mallory, 77 N. Y. 546, 33 Am. Rep. 664, a question arose as to liability for a death upon the high seas and in sustaining the jurisdiction of the court, the question was fully discussed

by Rapallo, J. Inter alia, he said (page 553, 77 N. Y., 33 Am. Rep. 664):

"The facts alleged by the complaint, and admitted by the demurrer, present a strong case for the application of the rule that the laws of the State to which the vessel belongs follow her until she comes within some other jurisdiction. The defendants, by whom the wrong is alleged to have been committed, were, at all times up to its final consummation by the death of the plaintiff's intestate, citizens and residents of this State, and subject to its laws, and the deceased was also a citizen of this State. The death was caused either by the illegal and negligent act done in this State of lading the dangerous and prohibited article on board the vessel and sending the deceased to sea in her thus exposed, or by the negligence or wrongful acts of the defendants committed at sea through their agents. The complaint does not distinctly specify which, but it must have been one or the other. If the latter, then at the place where the injury was consummated there was no law by which to determine whether or not it rendered the defendants liable to an action, unless the law of the State to which the vessel belonged followed her. In the present case the defendants were, at the time of the wrongful act or neglect, and of the injury, within this State and subject to its laws, and none of the objections, suggested in the various cases which have been cited, to subjecting them to liability under the Statute, for acts done out of the territory of the State, can apply. There can be no double liability, as suggested by Denio, J. in [Whitford v. Panama R. Co.] 23 N. Y. 467, 471, for the locus in quo was not subject to the laws of any other country; nor can it be said that the deceased or his representatives were under the protection of the laws of any other government, as is said in some of the other cases cited. It is a case where no confusion or injustice can result from the application of the principle declared by the Supreme Court," (referring to Crapo v. Kelly) "that the laws of the State as well as of the United States enacted within their respective spheres, follow the vessel when on the high seas."

Both vessels in the case at bar were a part of the territory of Delaware and as the law of that State gives a right of recovery, I see no sound reason why it should not apply and be enforced in these proceedings, and so hold, notwithstanding the ingenious argument presented to the contrary.

There will be decrees of limitation of liability and a reference to fix the amount of damages, with a provision for a proper distribution of the fund.